**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE TRAVELZOO INC.
SECURITIES LITIGATION

Electronically Filed

Civil Action No.: 11-CV-5531 (GBD)

**LEAD PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**
**THE CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

I.      THE APPLICABLE PLEADING STANDARDS ON A MOTION TO DISMISS ........... 6

II.     LEAD PLAINTIFFS PLEAD ACTIONABLE OMISSIONS ........................................... 7

        A.      Defendants Failed To Disclose That Getaways Was Competing with
                Core Travel ........................................................................................... 8

        B.      Omissions About the Impact of Getaways on Revenue Growth ......................... 13

        C.      Defendants Had A Duty To Speak The Truth About Getaways and
                Its Impact on Overall Second Quarter Revenue And Growth ............................. 16

        D.      Defendants' Omissions Were Material ................................................................. 17

                1.      Numerous Analysts Honed in on the Cannibalization Issue .................... 18

                2.      Defendants New Risk Language Concerning Shifting Revenue
                        From One Branch to Another Supports a Finding of Materiality ............. 20

III.    LEAD PLAINTIFFS HAVE SUFFICIENTLY ALLEGED SCIENTER ...................... 21

        A.      Applicable Legal Standards ................................................................................. 21

        B.      The Massive Amount and Unmistakable Pattern of the Individual Defendants'
                Insider Selling Is Probative of Their Motive to Defraud ..................................... 22

        C.      Plaintiffs Have Also Plead Conscious Misbehavior And/or Recklessness........... 27

IV.     LEAD PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION ........................... 28

V.      THE SAFE HARBOR DOES NOT INSULATE DEFENDANTS FROM
        LIABILITY ....................................................................................................................... 32

VI.     JANUS IS A RED HERRING............................................................................................. 34

VII.    PLAINTIFFS ADEQUATELY PLEAD CONTROL PERSON LIABILITY ................. 34

CONCLUSION.................................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995)................................................................22, 25

*Akerman v. Arotech Corp.*,
   608 F. Supp. 2d 372 (E.D.N.Y. 2009) ...............................................21

*Alaska Laborer Emps. Ret. Fund v. Scholastic Corp.*,
   No. 07 Civ. 7402 (GBD), 2010 WL 3910211 (S.D.N.Y. Sept. 30, 2010) ........................28, 31

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009).........................................................................6

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)..................................................................28

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009)..............................................25

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)......................................................................16, 17

*Bell Atl. Corp v. Twombly*,
   550 U.S. 544 (2007)..............................................................................6

*Bernhardt v. Tradition N. Am.*,
   676 F. Supp. 2d 301 (S.D.N.Y. 2009)..................................................6

*Caiola v. Citibank, N.A., N.Y.*,
   295 F.3d 312 (2d Cir. 2002)................................................................16

*City of Brockton Ret. Sys. v. Show Grp. Inc.*,
   540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008)                                    26

*City of Monroe Emps.' Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 657 (6th Cir. 2005) .............................................................13

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions Inc.*,
   No. 09 Civ. 8633 (JGK), 2011 WL 4527328 (S.D.N.Y. Sept. 30, 2011) ...............................23

*City of Roseville Emps.' Ret. Sys. v. Nokia Corp*,
   No. 10 CV00967, 2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) ................................16, 17, 22

*Dodona I, LLC v. Goldman, Sachs & Co.*,
   No. 10 Civ. 7497 (VM), 2012 WL 935815 (S.D.N.Y. Mar. 21, 2012) ...................................32

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................................29

*ECA & Local 134 IBEW Joint Pension Trust of Chi.*,
    553 F.3d 187 (2d Cir. 2009)...............................................................................7

*Fadem v. Ford Motor Co.*,
    No. 02 Civ. 0680 (SCH), 2003 WL 22227961 (S.D.N.Y. Sept. 25, 2003)............................17

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................13, 15, 20

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)...........................................................8, 17, 18, 21

*Garden City Emps. Ret. Sys. v. Psychiatric Solutions, Inc.*,
    No. 3:09-00882, 2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011)..........................13

*Geiger v. Solomon-Page Grp. Ltd.*,
    933 F. Supp. 1180 (S.D.N.Y. 1996)......................................................................21

*Glaser v. The 9 Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)..............................................................23, 26

*Glimcher Co. v. Deavers*,
    No. 2:09-CV-979, 2010 WL 1610709 (S.D. Ohio, Apr. 19, 2010)........................11

*Hall v. Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008)..............................................................15, 16, 28

*Hutchison v. Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011)...............................................................................7

*In re Adolor Corp. Sec. Litig.*,
    616 F. Supp. 2d 551 (E.D. Pa. 2009) ...............................................................11

*In re AIG, Inc. 2008 Sec. Litig.*,
    741 F. Supp. 2d 511 (S.D.N.Y. 2010)................................................................28

*In re Alstom SA*,
    406 F. Supp. 2d 433 (S.D.N.Y.2005)................................................................35

*In re Avon Products, Inc. Sec. Litig.*,
    No. 05 civ. 6803 (LAK) (MHA), 2009 WL 848017 (S.D.N.Y. Feb. 23, 2009)..........14, 26, 31

*In re Apollo Group, Inc. Sec. Litig.*,
    No. CV-10-1735-PHX-JAT, 2011 WL 5101787 (D. Ariz. Oct. 27, 2011) .............................26

*In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*,
　　No. 08-Civ.-11218 (DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ............................33

*In re AXIS Capital Holdings Ltd., Sec. Litig.*,
　　456 F. Supp. 2d 576 (S.D.N.Y. 2006)...................................................................................26

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
　　763 F. Supp. 2d 423 (S.D.N.Y. 2011)................................................................15, 18, 33, 34

*In re BISYS Sec. Litig.*,
　　397 F. Supp. 2d 430 (S.D.N.Y. 2005)...................................................................................28

*In re Blech Sec. Litig.*,
　　No. 94 civ 7696 RWS, 2002 WL 31356498 (S.D.N.Y. Oct. 17, 2002)................................35

*In re Bristol Myers Squibb Co. Sec. Litig.*,
　　586 F. Supp. 2d 148 (S.D.N.Y. 2008)...................................................................................30

*In re Bristol-Myers Squibb Sec. Litig.*,
　　00 Cv.1990 (SRC), 2005 WL 2007004 (D.N.J. Aug. 17, 2005)............................................28

*In re Citigroup, Inc. Sec. Litig.*,
　　330 F. Supp. 2d 367 (S.D.N.Y. 2004),
　　*aff'd sub nom., Albert Fadem Trust v. Citigroup, Inc.*,
　　165 F. App'x 928 (2d Cir. 2006) ..........................................................................................17

*In re Complete Mgmt. Inc. Sec. Lit.*,
　　153 F. Supp. 2d 314 (S.D.N.Y. 2001)...................................................................................24

*In re Countrywide Financial Corp. Derivative Litig.*,
　　554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................................................13

*In re Daou Sys., Inc., Sec. Litig.*,
　　411 F.3d 1006 (9th Cir. 2005) ..............................................................................................30

*In re Duane Reade Inc. Sec. Litig.*,
　　No. 02 Civ. 6478 (NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ...........................33

*In re Eastman Kodak*,
　　No. 6:05-CV-6326-MAT, 2006 WL 3149361 (W.D.N.Y. Nov.1, 2006)........................11, 31

*In re ESpeed, Inc. Sec. Litig.*,
　　457 F. Supp. 2d 266 (S.D.N.Y. 2006)...................................................................................28

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
　　352 F. Supp. 2d 429 (S.D.N.Y. 2005)...................................................................................35

*In re Forest Labs. Sec. Lit.*,
No. 05 Civ. 2827 (RMB), 2006 WL 5616712 (S.D.N.Y. July 21, 2006)................................24

*In re Gen. Elec. Co. Sec. Litig.*,
No. 09 Civ. 1951 (RJH), 2012 WL 90191 (S.D.N.Y. Jan. 11, 2012)......................................27

*In re Gildan Activewear, Inc., Sec. Litig.*,
636 F. Supp. 2d 261 (S.D.N.Y. 2009).......................................................................................26

*In re Health Mgmt. Sys. Inc. Sec. Litig.*,
No. 97 Civ. 1865 (HB), 1998 WL 283286 (S.D.N.Y. June 1, 1998).....................................26

*In re IAC Interactive Corp. Sec. Litig.*,
478 F. Supp. 2d 574 (S.D.N.Y. 2007).......................................................................................14

*In re Keyspan Corp., Sec. Litig.*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003).......................................................................................26

*In re Landry's Seafood Restaurant, Inc.*,
No. Civ. A. H-99-1948, 2001 WL 34115784 (S.D. Tex. Feb. 20, 2001) ...............................10

*In re Lehman Bros. Sec. ERISA Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011).................................................................................18, 34

*In re MBIA, Inc., Securities Litigation*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010).......................................................................................16

*In re Mercator Software, Inc. Sec. Litig.*,
161 F. Supp. 2d 143 (D. Conn. 2001).......................................................................................28

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
568 F. Supp. 2d 349 (S.D.N.Y. 2008).......................................................................................31

*In re OCA, Inc. Sec. & Derivative Litig.*,
No. 05-2165, 2006 WL 3747560 (E.D. La. Dec. 14, 2006) ...................................................20

*In re Oxford Health Plans, Inc. Sec. Litig.*,
187 F.R.D. 133 (S.D.N.Y. 1999) .............................................................................24, 33, 35

*In re Philip Servs. Corp. Sec. Litig.*,
383 F. Supp. 2d 463 (S.D.N.Y.2004).........................................................................................35

*In re Sadia, S.A. Sec. Litig.*,
643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009)...............................................................................38

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011).......................................................................................34

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)..................................................................................22, 23

*In re Scottish Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)...................................................................28, 30

*In re Sina Corp. Sec. Litig.*,
  No. 05 Civ 2154 (NRB), 2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006) ..............................23

*In re SLM Corp. Sec. Lit.*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010)...................................................................23

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
  No. 00 Civ. 1041(DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)..........................9, 16

*In re Spyglass, Inc., Sec. Litig.*,
  No. 99 C 512, 1999 WL 543197 (N.D. Ill. July 21, 1999) ...................................25

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)...................................................................20, 28

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993)......................................................................................16

*In re Tronox, Inc. Securities Litigation*,
  No. 09 Civ. 6220 (SAS), 2010 WL 2835545 (S.D.N.Y. June 28, 2010)............................29

*In re Van der Moolen Holding N.V. Sec. Litig*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005)...................................................................34

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011)...................................................................13, 33

*In re Xerox Corp. Sec. Litig.*,
  165 F. Supp. 2d 208 (D. Conn. 2001)....................................................................25

*In re XM Satellite Radio Holdings Sec. Litig.*,
  479 F. Supp. 2d 165 (D.D.C. 2007) ...................................................................14, 15

*Janus Capital Group, Inc. v. First Derivative Traders*,
  131 S. Ct. 2296 (2011)..........................................................................................33, 34

*Jones v. Corus Bankshares, Inc.*,
  701 F. Supp. 2d 1014 (N.D. Ill. 2010) ...................................................................27

*Koncelik v. Sav. Pharm., Inc.*,
  No. 08 Civ. 10262 (GBD), 2010 WL 3910307 (S.D.N.Y. Sept. 29, 2010).......................21, 27

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)................................................................................28

*Litwin v. Blackstone Group, L.P.*,
  634 F.3d 706 (2d Cir. 2011)................................................................................17

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007)................................................................22

*Matrixx Initiatives, Inc. v. Siracusano*,
  131 S. Ct. 1309 (2011)........................................................................................17

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
  900 F.2d 576 (2d Cir. 1990).................................................................................9

*Menkes v. Stolt-Nielsen S.A.*,
  No. 3:03cv409 (DJS), 2006 WL 1699603 (D. Conn. June 19, 2006)....................10

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  No 10-4701-cv, 2011 WL 6823204 (2d Cir. Dec. 29, 2011)................................18

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ......................................................................24, 25

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
  595 F.3d 86 (2d Cir. 2010)...............................................................................7, 9

*Prudential Sec. Inc. Ltd. P'ships Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996) ........................................................................32

*Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 657 (6th Cir. 2005) ..............................................................................13

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)................................................................................41

*Ronconi v. Larkin*,
  253 F. 3d 423 (9th Cir. 2001) .......................................................................26, 27

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000)..................................................................................22

*S.E.C. v. Landberg, No.*,
  11 civ. 0404 (PKC), 2011 WL 5116512 (S.D.N.Y. Oct. 26, 2011)........................34

*San Leandro Emergency Med. Group Pension Sharing Plan v. Philip Morris Cos., Inc.*,
  75 F.3d 801 (2d Cir. 1996).....................................................................................7

*Santa Fe Industries, Inc. v. Green*,
  430 U.S. 462 (1977) ........................................................................................17

*Sawant v. Ramsey*,
  570 F. Supp. 2d 336 (D. Conn. 2008) .........................................................24

*Sgalambo v. McKenzie*,
  739 F. Supp. 2d 453 (S.D.N.Y. 2010) ..........................................................27

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) ...................................................................32, 33

*SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*,
  448 F. App'x 116 (2d Cir. 2011) ...................................................................7

*Stevelman v. Alias Research Inc.*,
  174 F.3d 79 (2d Cir. 1999) ...........................................................................23

*Sys. of La v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ........................................................................31

*Tellabs, Inc. v. Maker Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ......................................................................................21

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
  672 F. Supp. 2d 596 (S.D.N.Y. 2009) ..........................................................28

*Western Washington Laborers-Emps. Pension Trust v. Panera Bread Co.*,
  697 F. Supp. 2d 1081 (E.D. Mo. 2010) ........................................................11

*Wilson v. Merrill Lynch & Co.*,
  No. 10-1528-cv, 2011 WL 5515958 (2d Cir. Nov. 14, 2011) ......................33

*Yoder v. Orthomolecular Nutrition Inst., Inc.*,
  751 F.2d 555 (2d Cir. 1985) ...........................................................................7

**Statutes**

15 U.S.C. 78u-4 ....................................................................................................32

**Rules**

Fed.R.Civ.P. 8(a)(2) ............................................................................................29

**Complaints**

*In re Tronox, Inc. Securities Litigation*,
  No. 09 Civ. 6220 (SAS), 2009 WL 5213810 (S.D.N.Y. Nov. 24, 2009) ..............29

*In re Travelzoo Inc. Shareholder Deriv. Litig.*,
    Case No. 11-6125-GBD (S.D.N.Y. Jan. 6, 2012)...............................................................35

## PRELIMINARY STATEMENT

This case is about a company that failed to disclose that a change to its business model would have an immediate negative impact on overall revenue growth during the second quarter of 2011.   While concealing this material information, Defendants (within only four months) unloaded $190 million of stock (including CEO Loughlin dumping 100%) in a pattern dramatically out of line with their previous trading.   Loughlin admitted that he was aware of this negative impact – cannibalization of other Company units – in March 2011, but decided to roll the dice and "see what happens".   Investors were never told that Defendants were knowingly playing a game of chance with the Company.   The truth did not come out until Travelzoo reported substantially lower than expected revenues in the second quarter of 2011 – and Travelzoo stock fell 30%, erasing hundreds of millions of dollars in market capitalization.[1]

Defendants never disclosed the cannibalization of revenues and never warned of the risk of internal competition in any Class Period disclosures.   That risk disclosure did not come out until *after* the Class Period.   There, just weeks ago, the Company warned investors – for the first time – in its most recent Annual Report of a "material" risk that "[e]xisting advertisers may shift from one advertising service (e.g. Top 20) to another (e.g. Local Deals and Getaways)" and that "[t]hese shifts…could result in no incremental revenue **or less revenue**…"   (Emphasis added.)

Although the Complaint is very straight-forward, Defendants move to dismiss a complaint that Plaintiffs did not plead.   Plaintiffs do not allege that Travelzoo falsely promised growth; rather, Plaintiffs allege Defendants made material omissions about the immediate negative impact of Getaways on overall revenues and overall growth.   Defendants throw every conceivable argument (safe harbor, puffery, control person, scienter, loss causation, *Janus*)

---

[1] Unless otherwise noted, all definitions are from the Amended Complaint (the "Complaint").   All paragraph cites, unless otherwise noted, are to the Amended Complaint.

against the wall – and repeatedly misframe the issues – hoping something will stick. Nothing does. Accordingly, Defendants' motions should be denied.

**STATEMENT OF FACTS**

**Background of the Company and Launch of Local Deals**

Founded in 1998 by Bartel, Travelzoo is a global Internet media company that informs over 23 million subscribers worldwide, as well as millions of website users, about travel, entertainment and local deals available from thousands of companies. Travelzoo's principal revenues, which it receives through its core travel business, are advertising revenues, and consist primarily of listing fees paid by travel companies, entertainment companies and local businesses to advertise their offers on Travelzoo's media properties. Advertising insertion orders are typically for periods between one and twelve months and are not automatically renewed. ¶ 37.

In August 2010, the Company expanded its business, launching Local Deals, a new service that allows Travelzoo subscribers to purchase vouchers for deals from *local* businesses, such as spas and restaurants, through the Travelzoo website. Vouchers are redeemable at the local businesses during the promotional period. In the Local Deals business, Travelzoo contracts with local businesses to offer deep discounts for potential customers (Travelzoo's existing subscribers). Then, Travelzoo sells the discounts (in the form of a voucher for goods or services) and keeps between 30% to 40% of total revenue the Company sells as commission. Unlike core travel revenue, which is straight advertising revenue paid up front by merchants, Local Deals revenue is dependent on the amount of vouchers sold. ¶¶ 41-42.

**Growth Has Been Travelzoo's Driver For Many Years**

The Company has repeatedly emphasized the necessity of growth: "In order to execute our business plan, we must continue to grow significantly." Travelzoo has also repeatedly stated

2

that its growth strategy is dependent on continued growth in revenue through both core travel and Local Deals.  ¶¶ 43-47.

**Local Deals' Role in Travelzoo's Growth**

Local Deals has been a key driver of Travelzoo's growth.  In the first quarter of its operation, which was the third quarter of 2010, Local Deals started slowly, with gross revenue of approximately $800,000.  On February 3, 2011, Loughlin discussed Local Deals with analysts on the fourth quarter 2010 conference call.  By its second quarter of operations, the fourth quarter of 2010, Local Deals' gross revenues were up approximately 1000%.  The growth of Local Deals did not go unnoticed by analysts covering the Company.  For example, on March 1, 2011, Wedbush analyst Edward Woo wrote a report in which he highlighted the Local Deals business, noting that it "generat[ed] an estimated $2.1 million in net revenues in February."  ¶¶ 48-51.

**Local Deals Getaways**

Travelzoo launched Getaways, a subset of its Local Deals Branch, in March 2011.  However, Defendants did not disclose the existence of Getaways until two months later on June 1, 2011.  Getaways deals usually include a night or two at a relatively high-end hotel or resort within a two-hour drive or short flight from subscribers' homes and include a fine-dining experience or resort credit plus other extras.  ¶ 52.  As with the other Local Deals, Getaways deals are available for a set duration.  Subscribers purchase a voucher on a Travelzoo website and redeem it at the hotel or resort.[2]  Unlike a hotel stay listed in Travelzoo's Top 20 emails, Getaways deals are targeted to subscribers in particular markets and vouchers are purchased on Travelzoo.com instead of referring customers to the hotel website for bookings.  Getaways were

---

[2] For example, Travelzoo offered a one-night stay for two people in the four-star The Chelsea Hotel in Atlantic City, N.J., with a 3-course dinner for two at The Chelsea Prime restaurant for $189.  Also included were spa and gym passes, free Wi-Fi and chairs, towels and use of umbrellas at the beach.  That price, which Travelzoo touted as a 56% discount, was good for Sunday to Thursday arrivals through Sept. 1, 2011.  ¶ 54.

geared toward subscribers who might not have considered staying at a nearby hotel, but would be tempted to do so if the offer is right.  ¶ 55.

From its start, Getaways deals cut into Travelzoo's core travel business.  As noted, Getaways deals were offered to subscribers who lived nearby a hotel or spa.  But hotel rooms are limited and there were not an infinite amount of deals that could be offered at any hotel.  Thus, offering a hotel through Getaways was at the expense of a core travel hotel deal.  ¶¶ 56, 121. And Defendants knew of the impact on revenues immediately.  *See* Musoff Decl. Ex. 3 at 6 (Defendants knew what revenues Getaways had brought in within one week).  Further, Loughlin admitted that he knew of the revenue cannibalization in March 2011:

> [W]e took a decision back in April. We ran a test…in March for the Getaways. And some folks will probably remember there was a Napa Valley deal that all of [a] sudden went through the roof. **And we just said to ourselves, okay, do we attack ourselves, or do we just ignore this, and what we did is that right, let's roll it out, see what happens.**  ¶ 119 [Emphasis added.][3]

Loughlin also admitted that revenue cannibalization caused lower core travel revenue growth in the second quarter of 2011.  ¶ 118.

Although both Getaways and core travel businesses related to hotel deals, advertising revenue received by the core travel business was, in certain circumstances, superior to voucher revenue received through Getaways.  Revenue was paid to the Company differently in the two branches.  In the core travel part of the business, advertising revenue was paid up front by hotels, airlines, or cruises in return for placing their business on Travelzoo's email lists which were sent to its worldwide subscribers.  In the Getaways business, revenue, only 30-40% of which went to Travelzoo, was paid by a customer for a voucher that could be redeemed at a local hotel.  ¶ 57.

---

[3] Further, upon information and belief, throughout the Class Period, Defendants knew that Getaways revenues were cutting into core travel revenues and growth because they had real-time access to up-to-date revenue information through software utilized by the Company.  ¶¶ 60-61.

On June 1, 2011, Defendants mentioned Getaways for the first time, trumpeting Getaways' success in a press release: "…40 upscale resorts have sold more than 28,000 incremental room nights through [the] new Travelzoo Getaways program..." ¶ 105. This release had no discussion about Getaways' impact on the Company's present or future revenue stream.

**Defendants' Stock Sales After The Launch of Getaways**

Within one month after deciding to launch Getaways in March 2011 – and well aware that Getaways' negative impact on overall revenue growth would cause Travelzoo to miss analysts' second quarter consensus estimates – Defendants began to unload their Travelzoo shares. Indeed, Defendants began dumping their shares right after the Company's April 21, 2011 first quarter announcement that sent Travelzoo stock soaring 27%. ¶ 84. On April 25, 2011, Urso sold 9,000 shares for proceeds of almost $1 million. Between April 26 and April 29, 2011, Bartel sold over 625,000 shares of Company stock for over $55 million. On May 2, 2011, Loughlin sold all his Travelzoo shares – 100% – for over $1 million. ¶¶ 89-90. Between May 25, 2011 and May 31, 2011, Bartel sold approximately 920,000 Travelzoo shares for proceeds of approximately $68 million. ¶¶ 99, 102, 103. The final wave of selling began the day of the June 1st press release announcing the existence of Getaways and continued after the June 8th press release touting Local Deals' success and Getaways. ¶¶ 105, 107. Between June 1, 2011 and June 15, 2011, Bartel sold about 900,000 shares for gross proceeds of approximately $61 million. ¶ 109. All the foregoing sales were made without public disclosure of the internal competition by Getaways and the impact of Getaways on Travelzoo's overall second quarter revenues.

**Defendants Disclose Getaways' Cannibalization of Core Travel Revenues and Growth**

On July 21, 2011, Defendants revealed to investors that the Company had materially lower than expected revenues and earnings in the 2Q11. Defendants reported second quarter revenue of $37.6 million, well below analyst estimates as high as $41.4 million and consensus of

$40.2 million, as well as earnings per share of $.30 per share, 21% below analyst consensus expectations of $.38 per share.  ¶ 112.  This revelation caused Travelzoo stock to collapse from approximately $90 per share to below $60 – over 30% – losing approximately $220 million in market capitalization in one day.  Travelzoo stock currently trades around $25 per share.  ¶ 14.

A few hours after the announcement of the lower than expected revenues, Defendants held a conference call with analysts.  In that call, after being pressed by numerous analysts, Loughlin admitted that Getaways' "cannibalization" of revenues from the Company's core travel business had impaired revenue growth in the core travel business.  ¶ 118.  Four of five analysts on the conference call, Frederick Moran, Eric Martinuzzi, Atul Bagga, and Edward Woo, asked Loughlin about either cannibalization, or the other side of the coin, weaker core travel revenues.  ¶¶ 115-16; *see also* ¶¶ 118-127.  Justin Patterson, the fifth analyst, had further insight into the issue and wrote in a report that revenue cannibalization was a *cause* of the revenue shortfall.  ¶¶ 117, 123.  Martinuzzi also wrote that the cannibalization *caused* the shortfall.  ¶ 126.

## ARGUMENT

## I.   THE APPLICABLE PLEADING STANDARDS ON A MOTION TO DISMISS

In deciding a motion to dismiss, "the allegations in the complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor."  *Bernhardt v. Tradition N. Am.*, 676 F. Supp. 2d 301, 304 (S.D.N.Y. 2009).  "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible…'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)).  For a claim to be plausible, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level" (*Twombly*, 550 U.S. at 555); that is, the claims must lie "across the line from conceivable to plausible."  *Id.* at 570.  Finally, a court must "assess the legal feasibility of the

complaint, not [weigh possible] evidence…" *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 559 (S.D.N.Y. 2011) (Daniels, J.) (citation and internal quotation marks omitted.).[4]

## II.    LEAD PLAINTIFFS PLEAD ACTIONABLE OMISSIONS

To state a claim under Section 10(b), "'[a] plaintiff must allege that…the defendant, acting with scienter, made a false material representation or *omitted to disclose material information* and that plaintiff's reliance on defendant's conduct caused plaintiff injury."' *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (emphasis added) (citation omitted).  A fact is "material" if there is a "substantial likelihood" that its disclosure "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (citation and internal quotation marks omitted).

During the Class Period, Defendants made materially misleading statements about external competition and Getaways.  Plaintiffs do not challenge these statements merely because "the Company desire[d]" growth, as Defendants contend.  Def. Mem. at 13.  Rather, they are challenged because Defendants failed to disclose that Travelzoo faced competition from within – Getaways – and that the internal competition from Getaways was having an immediate, negative impact on Travelzoo's overall second quarter 2011 revenue growth.  Such allegations are actionable and should be sustained.[5]

---

[4] In ruling on a motion to dismiss, the Court is to consider the complaint's allegations in the aggregate, not piecemeal.  *See Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 562 (2d Cir. 1985).

[5] Because the Complaint contains facts demonstrating that Defendants knew of material information that they omitted from investors, Defendants' reliance on cases in which vague, conclusory and indefinite statements were dismissed is inapposite.  (*Id.* at 14.)  *See e.g., SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*, 448 F. App'x 116, 118 (2d Cir. 2011) (optimistic statements about future profitability were puffery); *ECA & Local 134 IBEW Joint Pension Trust of Chi.*, 553 F.3d 187, 206 (2d Cir. 2009) ("general" statements on risk management); *San Leandro Emergency Med. Grp. Pension Sharing Plan v. Philip Morris Cos., Inc.*, 75 F. 3d 801, 806, 811 (2d Cir. 1996) (optimistic statements about earnings and expectations about performance were puffery).

### A.   Defendants Failed To Disclose That Getaways Was Competing with Core Travel

On the July 21, 2011 conference call, Loughlin made a startling admission to analysts (something that the market had figured out with the press release on the same date) about competition:  Getaways was cannibalizing core travel.  ¶¶ 118, 119.  It is difficult to imagine information that was more material to investors than that contained in Loughlin's end of Class Period admission.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (materiality satisfied by alleging a statement or omission that "a reasonable investor would have considered significant in making investment decisions").  In fact, Defendants recognized the materiality of this information – internal competition – in Travelzoo's new, post-Class Period risk disclosure:

> Existing advertisers may shift from one advertising service (e.g. Top 20) to another (e.g. Local Deals and Getaways).  *These shifts between advertising services by advertisers could result in no incremental revenue or less revenue* than in previous periods depending on the amount purchased by the advertisers, *and in particular with Local Deals and Getaways*, depending on how many vouchers are purchased by subscribers.  (Emphasis added.)

Despite Defendants' contemporaneous statements (i.e., admissions) and actions, they now argue on their motion that Plaintiffs' allegations are "facially implausible" and based on "their own definition of the word 'competitor.'"  Def. Mem. at 18.  But the statements challenged, when viewed against Loughlin's admission, demonstrate the bankruptcy of their argument.  For example, in the 2010 Annual Report, filed March 16, 2011, Defendants discussed competition at great length, identifying competitors, such as MSN and Yahoo! (advertising dollars), Google and Bing (pay-per-click), Kayak, Expedia, Priceline, Groupon (vouchers), and LivingSocial (vouchers), with whom the Company "face[s] intense competition."  ¶ 67.[6]

---

[6] Defendants made similar omissions about competition later in the Class Period.  *See* ¶¶ 69, 92.  That these omissions pertained to statements about "Travelzoo business as a whole, not any one of its constituent products" (Defs. Mem. at 18 n.10), is irrelevant.  As discussed, the omission relates to competition from within, not external competition.  Thus, it does not matter that the statements were made "on behalf of the Travelzoo business as a whole."  *Id.*

Defendants omitted any reference to Getaways, which had been launched in March 2011.[7]

In the July 21, 2011 conference call, Loughlin admitted that the internal cannibalization "moved hotel revenue from advertising [i.e, core travel] to a voucher model."   ¶ 118.   This language is strikingly similar to Defendants' post-Class Period risk language.  *See supra at 8.* Since hotels are limited, moving revenue from advertising to a voucher model – where the returns are typically smaller than with advertising – pits the two businesses against each other because both Travelzoo units are competing for the same hotel space.   This type of competition is consistent with the ordinary meaning of competition:  "The effort of two or more parties acting independently to secure the business of a third party by offering the most favorable terms." Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/competition.

Courts in this District have found misleading omissions relating to competition actionable.  For example, in *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000), the plaintiffs alleged that the defendants violated Section 10(b) by making misstatements about competition at Sotheby's, *e.g.*, "[c]ompetition in the international art market is intense….   The Company's primary auction competitor is Christie's."   *Id.* at *4 n.2.   The plaintiffs alleged this statement was misleading because Sotheby's omitted to disclose that it had a price-fixing agreement with Christie's. *Id.* at *4.   The court agreed, holding "that these statements could have led reasonable investors to believe that Sotheby's and Christie's were competing with each other in the usual manner, that is, through

---

[7] Defendants argue that Plaintiffs "point to no language in a section regarding Travelzoo's competitors rendered false."  Defs. Mem. at 18-19. The reason is simple: Plaintiffs do not claim that Defendants made any false or misleading statements about Travelzoo's competitors or that the identification of such competitors was intended to be an exhaustive list. Instead, Plaintiffs allege that Defendants did not accurately inform investors about competition by omitting to disclose that Getaways was competing with core travel.  Under these circumstances, the competition statements are actionable.  *Operating Local*, 595 F.3d at 92 ("[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers"); *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

price."  *Id.*   Similarly, here, the alleged omissions "could have led reasonable investors to believe" that the only competition issues Travelzoo faced were "in the usual manner[,]" *i.e.*, external competition.  *Id.  See also Menkes v. Stolt-Nielsen S.A.*, No. 3:03cv409 (DJS), 2006 WL 1699603, at *2-4 (D. Conn. June 19, 2006) (statements about increasing competition actionable where company did not disclose it was coordinating bidding with competitors).

Furthermore, courts have also found that cannibalization of revenues within a company can render statements misleading.  *In re Landry's Seafood Rest., Inc.*, No. Civ. A. H-99-1948, 2001 WL 34115784 (S.D. Tex. Feb. 20, 2001), is right on point.  In *Landry's*, the defendants stated, *inter alia*, that "Landry's expansion practice of clustering new restaurants in geographic areas was succeeding by speeding its overall expansion plan while enabling it to achieve significant savings in advertising and administrative expenses;" and that they were expecting "strong revenue growth."  *Id.* at *3.  The plaintiffs alleged these statements were misleading because the opening of new restaurants close to existing ones "resulted in increasing cannibalization of sales of existing restaurants in favor of newly opened restaurants, . . . thereby hurting Landry's overall revenue growth and reducing profits for the existing restaurants."  *Id.* at *5.  On the last day of the class period, the defendants announced lower than forecasted revenues.  After the corrective disclosure – which, like here, did not explicitly mention "cannibalization" – analysts reported that "the opening of new . . . restaurants too close to existing ones [resulted] in cannibalizations of the latter."  *Id.* at *6.  The court upheld the complaint, finding that "[p]laintiffs have satisfied…12(b)(6), 9(b) and the PSLRA."  *Id.* at *21.[8]

Defendants give short shrift to the alleged omissions concerning competition – addressing them in only 1 of 35 pages in their motion to dismiss.  But these omissions were

---

[8] The individual defendants in *Landry's*, like those here, engaged in suspicious insider trading of approximately $40 million, selling 30%, 74%, 82%, 87%, and 87% of their holdings, sufficient to demonstrate a strong inference of scienter.  *Id.* at *3, 22.

material.   And the few arguments Defendants do make relating to competition fail.   First, Defendants claim (*see* Defs. Mem. at 18) it is "illogical" to consider Travelzoo a competitor of itself.   But this is not a question of logic; rather, it is a question of whether the statement was misleading in context.[9]   Defendants' statements about competition were misleading because they did not disclose that Getaways was competing with another Travelzoo branch, core travel.[10]

Defendants also conclusorily assert that "Travelzoo generated greater revenues than it would have made through the core advertising product" (Defs. Mem. at 3).   But, Defendants offer *one* Getaways deal to back up this assertion – Loughlin stated in the July call that *one* Berlin deal netted more money for Getaways than it would have through core travel.   *See* Musoff Decl. Ex. 3 at 5.[11]   One deal is not, however, indicative of which vehicle, Getaways or core travel, on the whole netted more revenue – particularly when Loughlin admitted that revenues were impacted by the cannibalization.[12]

---

[9] Regardless, there is no "logical" problem with understanding the word 'competitor' to also cover competition within different branches of a company.

[10] Defendants' case citations on this semantic argument are distinguishable.   *See In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 566 (E.D. Pa. 2009) (term at issue was "randomization," a specific term of art in clinical drug trials, not an everyday word like "competitor"); *In re Eastman Kodak*,  No. 6:05-CV-6326-MAT, 2006 WL 3149361, at *7 (W.D.N.Y. Nov 1, 2006) (where defendants warned of "price competition" with "electronics manufacturers … investors could not have been misled into believing there was no price competition with [specific electronics competitor] Fuji").   Here, investors were mislead into believing that there was no competition within Travelzoo as the subject was simply ignored.

[11] Further, that Loughlin offered the Berlin deal as an example of how Getaways was purportedly better for the Company revenue-wise than core travel shows the materiality of Getaways impact on Travelzoo.

[12] Moreover, Defendants' notion is simply their own version of the facts – which is impermissible on a motion to dismiss.   *See, e.g.*, *Glimcher Co. v. Deavers*, No. 2:09-CV-979 2010 WL 1610709, at *3 (S.D. Ohio, Apr. 19, 2010).   Defendants cannot contradict Plaintiffs' well plead allegations that, as Loughlin admitted, Getaways revenue was at the expense of core travel revenue; Getaways deals often netted less revenue than core travel; and Travelzoo's overall revenue for the second quarter of 2011 was lower as a result (*see* ¶¶ 56-58, 68-70, 121).   To reiterate, five analysts honed in on the issue and two wrote reports stating that overall revenues had dropped as a result of the cannibalization.   *See* ¶ 123 (Morgan Keegan analyst Justin Patterson wrote that "**total net revenue was ($2M) below due to** 1) some **cannibalization** between the Media and Deals businesses…") (emphasis added); ¶ 126 (analyst Eric Martinuzzi wrote that "[w]e are modeling **lower core travel revenue and lower Local Deal net revenue** as we expect a **continuation** of modest core travel revenue **cannibalization** from Local Deals Getaways as was the case in Q2") (emphasis added).

11

Defendants' reliance on *Western Washington Laborers-Emps. Pension Trust v. Panera Bread Co.*, 697 F. Supp. 2d 1081 (E.D. Mo. 2010), also fails.  In *Panera*, the defendants disclosed that that the cannibalization at issue there had been "essentially built into these [comparisons] over years now." *Id.* at 1096.  Here, the cannibalization was simply not disclosed.  Further, there were no allegations in *Panera*, like here, that analysts linked the cannibalization to a corrective disclosure concerning lower revenues.

Defendants make other unavailing arguments, *e.g.,* Travelzoo's past financials were accurate, but that does not make the statements surrounding them accurate; and that Getaways was "not intended" (Defs. Mem. at 3, 11) to overlap with core travel, but that too is not the issue.  The issue (another unripe fact issue) is Loughlin admitted he knew of the overlap issue in March 2011 but went forward with Getaways without disclosing this to the investors.  *See* ¶ 119.

Finally, Defendants also cherry-pick Loughlin's statements during the July conference call, but a look at all his statements demonstrates that he admitted the revenue cannibalization was a factor in the lower revenues.  Defendants concede that Loughlin stated in the call that "to some degree, there is cannibalization[,]" but emphasize that he stated, in another sense, that "there is no cannibalization."  Musoff Decl. Ex. 3 at 10.  The context of the latter statement was that Travelzoo's "traditional" business is getting consumers to fly, for example, from New York to Los Angeles, rather than get a New Yorker to stay at a local hotel.  *See id.*  Defendants argue that because Travelzoo's traditional core travel and Getaways branches have different subscriber bases, there could be no cannibalization.  But this does not follow:  the point is that offering a core travel deal, or Getaways deal, at a particular hotel was mutually exclusive – as Loughlin admitted.  *See* ¶ 121 ("I am willing to replace the hotel advertising solution with this Getaway solution…").  In other words, it was not a battle for the same hotel room between two

simultaneous offers; it was a battle between which offer would be made.   And one offer (Getaways) was at the expense of, or cannibalized, the other (core travel).   Thus, the real issue is the difference in revenue received from core travel or Getaways – and, as Plaintiffs have alleged, Getaways revenue was often less than that received through core travel.  ¶¶ 56-58.

### B.    Omissions About the Impact of Getaways on Revenue Growth

Defendants repeatedly omitted to disclose crucial facts relating to revenue growth to investors; namely, that Getaways would have a negative impact on overall revenue growth at Travelzoo.  *See* ¶¶56-66.  For example, in the 2010 Annual Report, Defendants stated that one of the pillars of their growth strategy was to "grow our revenue…, through our Local Deals e-mail alert service and through Fly.com."   ¶ 76.   *See also* ¶¶ 81, 85.   This is not, as Defendants contend, puffery (*see* Defs. Mem. at 14).   Indeed, courts have held similar statements and omissions materially misleading.  *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 572 (S.D.N.Y. 2011) (statement that "we will have the resources to pursue the growth of our businesses in an especially health [sic] and efficient way" was misleading); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 191 (S.D.N.Y. 2010) ("we enter 2007 ideally positioned to capitalize on secular growth trends in the industry" not puffery) (citation omitted); *City of Monroe Emps.' Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 657, 671 (6th Cir. 2005) (statements supported by specific facts are not puffery); *Garden City Emps.' Ret. Sys. v. Psychiatric Solutions, Inc.*, No. 3:09-00882, 2011 WL 1335803, at *50 (M.D. Tenn. Mar. 31, 2011) (statements about growth contradicted by "hard facts").

Courts have also found omissions actionable where they related to a change in business model like the change Defendants effected here with Getaways.   For example, in *In re Countrywide Financial Corp. Derivative Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008), the plaintiffs alleged that the defendants omitted to disclose "the material fact that [they were]

making undisclosed fundamental changes to the Company's business model that relied on riskier products . . . " *Id.* at 1075 (citation omitted). The court found such omissions actionable where the defendants had changed Countrywide's business model with reference to underwriting standards. *See id.* at 1077. Here, Defendants did not disclose the "fundamental change" that Getaways effected by cannibalizing revenues from the core travel branch. *Id.* at 1075.

Defendants cite *In re Avon Products, Inc. Sec. Litig.*, No. 05 civ. 6803 (LAK) (MHA), 2009 WL 848017 (S.D.N.Y. Feb. 23, 2009), in support of the proposition that alleged misstatements about growth cannot be actionable if a company does, in fact, grow. But Defendants are knocking down a straw man of their own making: Plaintiffs do not allege that Travelzoo failed to grow. Plaintiffs allege that Travelzoo grew less than expected due to the undisclosed revenue cannibalization. Defendants also claim in their discussion of *Avon* that Plaintiffs "have not pleaded any particularized facts indicating that a purported overlap between [Getaways and core travel] adversely impacted Travelzoo's growth." Defs. Mem. at 16. But that is exactly what Plaintiffs do by pleading how revenues differed between the core travel and Getaways branches (*see* ¶¶ 57-58); that Loughlin admitted the cannibalization; and that analysts connected the cannibalization, or "overlap," with Travelzoo's lower revenues and growth.[13]

Defendants' citations to *In re IAC Interactive Corp. Sec. Litig.*, 478 F. Supp. 2d 574, 591-92 (S.D.N.Y. 2007), and *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 183 (D.D.C. 2007), fare no better. In *IAC*, the plaintiffs could not back up their allegations that the defendants made misstatements about the health of the company's travel business because the "discontent of one hotel chain" was not evidence of an overarching problem. Here, Loughlin admits that there was revenue cannibalization; revenue growth was materially less than expected

---

[13] Further, although Defendants trumpet the fact that analysts congratulated them on the growth, Travelzoo CFO Glen Ceremony, who replaced Lee after he resigned, stated that Defendants were "of course not happy with the growth rate." *See* Musoff Decl. Ex. 3 at 8.

in the second quarter, causing the stock to plummet; a large number of analysts focused on the issue and several identified it as a cause of the lower 2Q revenues; and after the Class Period, Defendants materially changed the risk language in Travelzoo's Annual Report relating to revenue competition between branches.  *See* ¶¶ 56-57; 121.[14]

Similarly, in *XM*, the plaintiffs alleged that the defendants made misrepresentations concerning marketing costs.  479 F. Supp 2d at 181.  The court held that the defendants could not have known about increased subscriber acquisition costs until after the quarter was over.  *Id.* Here, again, Loughlin admitted that he knew of the cannibalization issue in March, 2011.  More importantly, Loughlin admitted in the July conference call that he knew of how many Getaways vouchers were purchased *one week* after Defendants launched a particular Getaways deal.  *See* Musoff Decl. Ex. 3 at 6 ("When you run a Getaway, you don't know what happen[s] until next week…. You honestly don't know the answer until the week from the day you do it").  Finally, Defendants knew that Getaways revenues cut into core travel revenues and growth because they had real-time access to up-to-date revenue information.  ¶ 61.

Defendants also trot out the inevitable "fraud by hindsight" argument – but it does not bear scrutiny:  Plaintiffs plead contemporaneous public statements rendered misleading *when made* by the revenue cannibalization; Loughlin admitted that he knew of the cannibalization issue back in March 2011; and Plaintiffs plead detailed allegations linking the cannibalization issue to the Class Period-ending corrective disclosure.  This is not fraud by hindsight.  Thus, this is very different from *Nokia*, where this Court characterized as fraud by hindsight forward-looking statements that plaintiffs alleged offered "too rosy a view" of future business.[15]

---

[14] Ironically, *IAC*'s holding (that one example does not show a trend) applies to Loughlin's claim that Getaways provided greater overall revenues for the Company – for which he cites one Berlin hotel deal.  *See infra* at 11.

[15] *Cf. Freudenberg*, 712 F. Supp. at 171 ("it is not 'fraud by hindsight' when statements related to a loan's existing quality and risks were false and misleading when made"); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp.

### C.    Defendants Had A Duty To Speak The Truth About Getaways and Its Impact on Overall Second Quarter Revenue And Growth

"[A]n omission is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." *Sotheby's*, 2000 WL 1234601, at *4 (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).   "A duty to disclose arises whenever secret information renders prior public statements materially misleading." *Time Warner*, 9 F.3d at 268.   As noted above, a statement is materially misleading if "there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Id.* at 267-68 (citation omitted).   Thus, "[w]hen a corporation does make a disclosure-whether it be voluntary or required-there is a duty to make it complete and accurate." *Sotheby's*, 2000 WL 1234601, at *4 (citation omitted).[16]

Plaintiffs allege that Defendants made multiple statements about growth and competition throughout the Class Period.   ¶¶ 67-108.   Having made these statements, as the cases above demonstrate, Defendants had an affirmative duty to speak the whole truth.   Instead, they withheld material information about Getaways and its impact on overall second quarter revenues. Accordingly, Defendants' discussion of these subjects was misleading and therefore actionable.[17]

---

2d 212, 228-229 (S.D.N.Y. 2008) (rejecting "fraud by hindsight" argument where undisclosed breaches of license agreement allegedly existed at the time of statements); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 487 (S.D.N.Y. 2011) ("[t]he incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made").

[16] *Cf. In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 579 (S.D.N.Y. 2010) ("Of course, the lack of an independent duty to speak in the first instance becomes irrelevant once a party chooses to discuss material issues, because upon choosing to speak one "ha[s] a duty to be both accurate and complete") (citing *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002)); *see also Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 226 (S.D.N.Y.2008) ("Once defendants choose to speak ..., they undertake a duty to speak truthfully and to make such additional disclosures ... necessary to avoid rendering the statements misleading" (internal quotation marks omitted) (second ellipses in original)).

[17] Further, Defendants obviously thought launching Getaways was a fact of material importance or they would not have disclosed it on June 1, 2011.

The facts here are in stark contrast to those before this Court in *City of Roseville Emps.'* *Ret. Sys. v. Nokia Corp*, No. 10 CV00967, 2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) (Daniels J.). In *Nokia*, the plaintiffs alleged that the defendants made misleading statements about Nokia's market share in mobile communications. *Id.* This Court held that the "[d]efendants were not required . . . to disclose [facts about a particular product] merely because a reasonable investor would very much like to know that fact." *Id.* But this Court also held: "The question is whether such information was necessary in light of the context, manner of presentation, and language of the statements . . . so . . . what was revealed would not be so incomplete as to mislead." *Id.* (Citations omitted). Here, Plaintiffs allege Defendants failed to disclose crucial information about internal competition from Getaways – and Getaways' cannibalization of core travel revenues *was* information required to render the statements not misleading.[18]

### D.    Defendants' Omissions Were Material

As this Court noted in *Nokia*, 2011 WL 7158548, at *8 n.10, "a complaint may not properly be dismissed…on the ground that the alleged … omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." (Citation omitted).[19] Materiality is not a simple quantitative measurement. *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318-19 (2011) (rejecting quantitative bright-line rule that a certain level of statistical significance is needed to

---

[18] Recognizing the strength of Plaintiffs' allegations, Defendants mischaracterize the "core" of Plaintiffs' allegations, contending that they "amount to nothing more than an unfounded attack on the business decisions of Travelzoo's management." Defs. Mem. at 19. But this characterization bears no relation to the allegations in the Complaint. Indeed, Defendants cannot even cite to one paragraph in the Complaint wherein Plaintiffs supposedly allege that Defendants mismanaged Travelzoo. Instead, they rely on inapposite cases such as *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479-80 (1977) (mismanagement case concerning minority shareholder and short-form merger dressed up as a Section 10(b) action); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375 (S.D.N.Y. 2004), *aff'd sub nom.*, *Albert Fadem Trust v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006); and *Fadem v. Ford Motor Co.*, No. 02 Civ. 0680 (SCH), 2003 WL 22227961, at *4 (S.D.N.Y. Sept. 25, 2003).

[19] *See also Basic Inc. v. Lexinson*, 485 U.S. 224, 240 (1988) (materiality is inherently an intensely "fact-specific inquiry" that "depends on the significance the reasonable investor would place on the withheld or misrepresented information"); *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011).

plead materiality).  Indeed, qualitative factors are crucial when determining materiality.  *Ganino*, 228 F.3d at 162-63 (misstatements relating to a quantitatively small amount of fees significant; "whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise" was "of particular significance" in materiality calculus).  *Id.* at 63.  Here, Defendants omitted information they knew would cause Travelzoo to "fail[] to meet analysts' consensus expectations" – revenue cannibalization.  *id.*

### 1.     Numerous Analysts Honed in on the Cannibalization Issue

As noted above by the Second Circuit in *Ganino*, analysts' keen attention to cannibalization shows it was a material issue.  228 F.3d at 162-63; *see also In re Lehman Bros. Sec. ERISA Litig.*, 799 F. Supp. 2d 258, 281 (S.D.N.Y. 2011) (fact that net leverage was "significant financial metric" for analysts supported finding of materiality); *cf. New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, No 10-4701-cv, 2011 WL 6823204, at *4 (2d Cir. Dec. 29, 2011) (concealment of failure to meet analysts' expectations was material); *Bear Stearns*, 763 F. Supp. 2d at 497 (whether "management[] expect[ed] that the misstatement will result in a significant market reaction" significant factor in materiality analysis).

Here, five analysts grilled Loughlin on the cannibalization issue and two wrote in reports that the cannibalization had caused the lower than expected overall revenues.  And Loughlin did not volunteer the disclosure about cannibalization – he was pressed into admitting it when repeatedly pressed on the issue.  *See* ¶¶ 118-26.  This further highlights the material nature of the cannibalization.

Moreover, Plaintiffs allege that analysts continually reacted to Defendants' statements in crafting their estimates.  For example, after a February conference call, Wedbush analyst Woo wrote on March 1st that "Travelzoo continues to quickly ramp up its Local Deals business,

generating…$2.1 million in net revenues in February."  ¶¶ 48-51.  And after Defendants' April

21st announcement and analyst presentation (both of which omitted key facts):

- Analyst Bagga issued an April 21, 2011 report raising second quarter estimates to $39 million, up from $33.9 million, and earnings per share estimates to $.38 from $.29; (¶ 83)

- On April 25, 2011, analyst Moran upgraded Travelzoo to a buy and placed a $123 price target on shares; (¶ 87)

- On April 25, 2011, analyst Martinuzzi raised revenue expectations for the second quarter to $41.4 million and earnings per share to $.42; (¶ 88)

- After several statements in early June (*see* ¶¶ 105, 107), on June 17, 2011, analyst Bagga reiterated his $.38 earnings per share figure for Travelzoo; (¶ 110)

- On June 22, 2011, analyst Frederick Moran touted Local Deals' success.  (¶ 111).[20]

Thus, after analysts continually reacted to Defendants' statements, Defendants cannot claim that

they had nothing to do with analyst expectations – Defendants *created* such expectations.

Yet, Defendants try to hide behind the fact that the Company does not issue guidance on

earnings and revenues.  As an initial matter, Plaintiffs do not allege Defendants issued

misleading guidance.  But more importantly, Defendants knew full well what analysts were

reporting about the Company.  A few weeks before the start of the Class Period, on March 2,

2011, Loughlin stated on Jim Cramer's *Mad Money* on CNBC:  "[T]he analysts give guidance.

But you know what?  We beat them…. It is a growth story and [an] exciting opportunity."  ¶ 10.

Indeed, Travelzoo met or exceeded analysts' estimates for seven straight quarters.  The shortfall

in the 2Q11, the subject of this case, was the first shortfall since 2Q09.

---

[20] As background, Defendants indisputably made revenue growth Travelzoo's story from the beginning as Travelzoo repeatedly emphasized in very particular terms the importance of continual growth, including revenue growth.  In press release after press release, conference call after conference call, the story was the same – the Company's meteoric and unbroken growth.  The Company's continued drumbeat on growth is significant because it conditioned analysts to view Travelzoo as a growth company, and growth companies generally trade at premiums because their growth is taken into account when valuing the company.  ¶12.

Finally, Defendants' claim that Getaways only concerned 200 deals in the second quarter – which is, regardless, an impermissible factual argument – is not dispositive.  Indeed, two hundred deals – and 28,000 incremental hotel room nights – (*see* ¶ 105) caused a material impact on revenues.  In any case, that is not an issue for a pleading motion.

### 2.   Defendants New Risk Language Concerning Shifting Revenue From One Branch to Another Supports a Finding of Materiality

Defendants' change to the risk language relating to competition in Travelzoo's 2011 Annual Report, just filed on February 21, 2012, speaks volumes:

> **Any or all of the risks listed below** as well as other variables affecting our operating results could have a **material** adverse effect on our business, our quarterly and annual operating results or financial condition, which could cause the market price of our stock to decline or cause substantial volatility in our stock price, in which event the value of your common stock could decline…
>
> Our existing advertisers may shift from one advertising service to another, which may adversely affect our revenue.
>
> Existing advertisers may shift from one advertising service (e.g. Top 20) to another (e.g. Local Deals and Getaways). **These shifts between advertising services by advertisers could result in no incremental revenue or less revenue** than in previous periods depending on the amount purchased by the advertisers, **and in particular with Local Deals and Getaways**, depending on how many vouchers are purchased by subscribers.  (Emphasis added).

This new language vindicates the heart of Plaintiffs' case – the shift of revenue from advertising services (core travel) to Getaways can cause *less* revenue.  *See* ¶¶ 6-9.[21]  Courts have agreed that post-Class Period admissions are probative of materiality.  *See, e.g., Freudenberg*, 712 F. Supp. 2d at 184 (failure to disclose that loan-to-value ratios "were based on over-stated appraisals and were not updated"; post-class period admission to SEC concerning such ratios probative of materiality); *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2006 WL 3747560, at *13

---

[21] The Court can take judicial notice of the 2011 Annual Report.  *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 276 (S.D.N.Y. 2008).

(E.D. La. Dec. 14, 2006) (post-class period admission of internal control problems probative of falsity of statements concerning internal controls).

Finally, substantial stock drops are also evidence of materiality. *See e.g., Geiger v. Solomon-Page Group Ltd.*, 933 F. Supp. 1180, 1188 (S.D.N.Y. 1996). Here, Travelzoo stock collapsed after the Company announced lower than expected revenues on July 21, 2011. ¶ 114.

## III.   LEAD PLAINTIFFS HAVE SUFFICIENTLY ALLEGED SCIENTER

### A.   Applicable Legal Standards

Section 78u-4(b)(2) of the PSLRA requires plaintiffs to plead facts giving rise to a "strong inference" that defendants acted with scienter. According to the Supreme Court, "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs, Inc. v. Maker Issues & Rights, Ltd.*, 551 U.S. 308 (2007). In *Tellabs*, the Supreme Court explained that the court must take the plaintiffs' allegations as true, *see id.* at 323, consider the allegations collectively and not "scrutinize [them] in isolation," (*see id.* at 326) and ultimately determine if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Id.* at 324.[22]   A complaint establishes a strong inference of scienter by pleading facts that either constitute strong circumstantial evidence of conscious misbehavior or recklessness, or show that defendants had both motive and opportunity to commit fraud. *Koncelik v. Sav. Pharm., Inc.*, No. 08 Civ. 10262 (GBD), 2010 WL 3910307, at *6 (S.D.N.Y. Sept. 29, 2010) (Daniels, J.)

---

[22] The inference of "scienter need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 324 (citation and internal quotation marks omitted). Instead, an inference of scienter is "strong" when it is at least as likely as any other inference. *Id.*; *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009) ("When the competing inferences rest in equipoise, the tie goes to the plaintiff'") (citation and internal quotations omitted). Thus, under *Tellabs*, it is Defendants' burden to show that the Complaint's allegations give rise to an inference of innocent behavior that is stronger than the inference of scienter.

### B.   The Massive Amount and Unmistakable Pattern of the Individual Defendants' Insider Selling Is Probative of Their Motive to Defraud

As this Court noted in *Nokia*, to raise a strong inference of scienter through "motive and opportunity" to defraud, plaintiffs must allege that the defendants "benefitted in some concrete and personal way from the purported fraud."  2011 WL 7158548, at *10.  Here, the Individual Defendants benefitted to the tune of $188.4 million.[23]

The Second Circuit has repeatedly held that unusual insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter.  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 64 (2d Cir. 2001) (citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)).  *See also Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 150 (D. Conn. 2007) (insider trading is suspicious…when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information) (citation and internal quotation marks omitted), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).  Factors considered in determining whether insider trading activity is unusual include the profit from the sales, the portion sold, the change in volume of insider sales, and the number of insiders selling.  *Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000).

In *Scholastic*, the plaintiffs alleged that the defendant Marchuk realized over $1.25 million in gross proceeds from the sale of his stock in Scholastic during the class period.  252 F.3d at 74.  Marchuk sold a total of 19,400 shares, or approximately 80 percent of his holdings of Scholastic stock in a matter of one week from the end of 1996 through 1997; prior to these sales, Marchuk had not sold a single share of company stock since April 11, 1995.  The Second Circuit held this plead a strong inference of scienter:

---

[23] Indeed, to put things in perspective, the Individual Defendants netted three times as much in proceeds ($188.4 million) as the Company has earned in net income since the Company's 2002 IPO (approximately $60.4 million).

> Motive is the stimulus that causes a person or entity to act or to fail to act.  Such stimulus ordinarily anticipates a concrete benefit defendant would realize by his conduct.  Plaintiffs allege that defendant Marchuk was motivated to withhold damaging information about Goosebumps sales and returns so that he could sell his Scholastic stock **** at a higher price . . . .  Marchuk is alleged to have sold 80 percent of his holdings within a matter of days for a not insignificant profit, after having sold no Scholastic stock since 1995.  Therefore, . . . plaintiffs have adequately alleged [Marchuk's] motive and opportunity . . . for concealing facts that ultimately caused the price of [the] stock to drop.

*Id.* at 74-75.  The sales by the Individual Defendants far exceed those in *Scholastic*.  Indeed, the pattern and suspicious nature of sales here is simply breathtaking – a veritable textbook case of insider selling demonstrating motive.  Three of four Defendant insiders sold almost $190 million during a very brief time before disclosing the truth about Travelzoo's second quarter revenues:

- Bartel did not sell any Travelzoo shares in the prior four and a half years.  Then, within seven weeks, Bartel sold a whopping $186 million worth of Travelzoo stock – 22% of his Travelzoo shares.

- Loughlin, who never sold one Travelzoo share before, sold 100% of his stock on May 2, 2011 – just ten days after the first quarter 2011 earnings and revenue announcement that sent Travelzoo stock soaring.

- Urso, who sold Travelzoo stock only once in over six years, sold 95% of her Travelzoo stock on April 25, 2011.[24]

- The fact that Loughlin initiated a 10b-5 trading plan a few weeks after the end of the Class Period (*see* ¶129) also highlights the suspicious nature of his May 2011 sales.[25]

---

[24] Urso spills a lot of ink discussing how she also sold Travelzoo stock once before the Class Period – but one prior sale in six years still marks her Class Period sales as out of line with her prior trading.  With reference to Urso's one prior sale – and Urso is the only Individual Defendant to have sold at all (once) in the prior 4 ½ years – Defendants cite *In re Sina Corp. Sec. Litig.*, No. 05 Civ 2154 (NRB), 2006 WL 2742048, at *11 (S.D.N.Y. Sept. 26, 2006), but that case does not apply here.  In *Sina*, the plaintiffs failed to include purchases in their pleading and the defendants collectively *increased* their holdings during the class period.  Urso also cites cases standing for the proposition that her signing the March 16, 2011 Annual Report does not suffice to plead scienter.  *See* Urso Mem. at 11.  Plaintiffs do not allege otherwise as they plead Urso's scienter based on motive to defraud and conscious misbehavior and/or recklessness.

[25] Loughlin cites to *Glaser v. The 9 Ltd.*, 772 F. Supp. 2d at 573, 592 (S.D.N.Y. 2011), for the proposition that 10b5-1 plans are "benign on their face[,]" but Loughlin misses the point; the point is that several months after selling 100% of his stock in one day, and after Travelzoo stock collapsed, he initiated a trading plan.  This fact, together with the other insider trading allegations, is suspicious because it suggests he learned a lesson and was planning to cover his tracks on any sales of future Travelzoo stock grants (which, as CEO, he would inevitably receive).  *Cf.* Travelzoo's Guide to Business Conduct and Ethics, which states that "[r]epresentatives who have access to confidential information are not permitted to use or share that information for stock trading purposes…" ¶ 143.

*See also Stevelman v. Alias Research Inc.*, 174 F.3d 79, 82, 85-86 (2d Cir. 1999) (reversing dismissal where CEO sold 40% and non-defendants sold undisclosed amounts); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions Inc.*, No. 09 Civ. 8633 (JGK), 2011 WL 4527328, at *21 (S.D.N.Y. Sept. 30, 2011) ("concrete and massive economic benefit that accrued to the defendants" probative of motive); *In re SLM Corp. Sec. Lit.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) (finding motive for one defendant who, like Loughlin, dumped all his shares, as well as the company under corporate scienter theory); *Sawant v. Ramsey*, 570 F. Supp. 2d 336, 346 (D. Conn. 2008) (66% and 94% probative of motive to defraud); *In re Complete Mgmt. Inc. Sec. Lit.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (90% and 33% sufficient to plead motive); *In re Forest Labs. Sec. Lit.*, No. 05 Civ. 2827 (RMB), 2006 WL 5616712, at *12 (S.D.N.Y. July 21, 2006) ($300 million in sales by eight individuals probative of motive to defraud); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ("$78 million profit…is… massive by any measure"); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (sale of 2.1% raised scienter inference where sale was $900 million).

Defendants do not say anything convincing about the compelling motive allegations plead against them.  Loughlin concedes he unloaded 100% of his stock, but claims he did so before making alleged misstatements.  That is inaccurate – Loughlin made omissions concerning competition in Travelzoo's Annual Report on March 16, 2011, is quoted in the April press release, and made oral statements in the April 2011 call.  ¶¶ 67, 85.  Loughlin, as CEO, is also responsible for all the April 21st statements under group pleading.  *See infra* at 34 n.38; ¶¶ 79-82.

Loughlin and Urso claim that their April 2011 sales undermine scienter since it was three months before the end of the Class Period.  This does not follow – in fact, April 2011 was a

perfect time for them to sell since immediately following the publication of the April 21, 2011 release, shares of Travelzoo rallied almost $20.00 per share, or almost 27%, to $93.70 per share. ¶ 84. It speaks volumes that all three selling Individual Defendants sold stock at this time: On April 25, 2011, Urso sold 9,000 shares – 95% of her Travelzoo holdings – at prices as high as the Class Period peak of $102.25 per share, for proceeds of almost $1 million; between April 26 and April 29, 2011, Bartel sold over 625,000 shares for prices as high as $91.87 per share to realize gross proceeds of over $55 million (¶ 89); and on May 2, 2011, Loughlin unloaded 100% of his Travelzoo shares for prices as high as $82 per share for over $1 million (¶ 90).[26]

Indeed, the Individual Defendants' concentrated April 2011 selling is suspicious. Defendants launched Getaways in March, 2011; by April 2011 they were unloading their shares knowing full well the negative impact Getaways was having on overall revenue growth – and that second quarter revenues would fall materially short of analysts' estimates. Courts have held concentrated selling to be probative of motive. *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1186 (S.D. Cal. 2009) (sale of 90% within one and a half months probative of scienter); *In re Spyglass, Inc., Sec. Litig.*, No. 99 C 512, 1999 WL 543197, at *6 (N.D. Ill. July 21, 1999) (court found scienter where "most of the sales occurring within a one-month period"); *cf. In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 222 (D. Conn. 2001 ) (motive plead where "sales took place shortly after" misleading statements causing rise in stock price).

Defendants attempt to explain away their whopping insider trading by a litany of case citations – but their case authorities only highlight the significance of their sales. For example, *Acito* could not have been more different. In *Acito*, only one of four individual defendants sold; he had recently sold ten times as many shares; his sale comprised only 11% of his holdings.

---

[26] To put the prices of Defendants' April 2011 sales in context, Travelzoo stock skyrocketed from around $15 per share in August 2010 (at the time Local Deals was launched) to around $94 per share after Defendants' glowing April 21, 2011 announcement – a meteoric rise of over 500%.

47 F.3d at 54.  This is night and day to the situation here, where three of four Individual

Defendants sold 100%, 95%, and 22% of their holdings; their sales are dramatically out of line

with past trading practices; much of their sales were on the heels of the April announcement

causing the stock to skyrocket; and proceeds here are $188.4 million.[27]

*Avon* is also distinguishable.  In that case, two defendants owned more stock at the end of

the class period than at the beginning, and a third defendant had divested his stock as part of his

retirement and a gift to his wife.  2009 WL 848017, at *21.  Further, unlike in *Avon*, *id.*, where

no defendant made sales after a certain date during the class period, Bartel sold through June 15,

2011.  ¶ 138.  *See also City of Brockton Ret. Sys. v. Show Grp. Inc.*, 540 F. Supp. 2d 464, 475

(S.D.N.Y. 2008) (where insiders "rushed to cash out before financial statements were restated[,]"

selling 10 weeks prior to disclosure was not suspicious; here, there was no rush to restate, and

Loughlin and Urso unloaded 100% and 95% of their shares, respectively, six weeks after

Getaways began to negatively affect overall revenues, and also after the glowing first quarter

results) (citations and internal quotation marks omitted); *In re Keyspan Corp., Sec. Litig.*, 383 F.

Supp. 2d 358, 386 (E.D.N.Y. 2003) (no sales were made at "particularly propitious moment").

Similarly, the insider trading in *In re Gildan Activewear, Inc., Sec. Litig.*, 636 F. Supp. 2d

261, 271-72 and n.5 (S.D.N.Y. 2009) was very different.  In *Gildan*, "the trades occurred weeks

before the principal allegation of material misstatement."  *Id.* at 271.  But here Defendants made

---

[27] Defendants make a lot of hay about the fact that Bartel sold 22%, holding 78% of his stock.  First, Bartel, the
founder of the Company, clearly wanted to remain the majority shareholder of Travelzoo so he could control the
Company.  Second, Bartel's sales were huge in amount ($186 million) – and courts have held that lower percentages
are unusual in amount when the profits are especially exorbitant.  *See, e.g.*, *Oracle Corp.*, 380 F.3d 1226 at 1232
(finding sale of 2.1% of holdings sufficient to raise inference of scienter where sale resulted in "truly astronomical
figure" of $900 million).  Third, Bartel sold $186 million in seven weeks when he sold nothing in the past four and
half years.  That is dramatically unusual trading.  *See* ¶ 139.  Fourth, Bartel and Urso sold immediately after
Travelzoo stock skyrocketed following the April 21, 2011 release, and Loughlin sold 100% only 10 days later.

sales after March and April misstatements and Bartel traded into June 2011.  Further, the sales in *Gildan* comprised only 22.5% and 4.9% – and there were no past trading allegations like here.[28]

### C.      Plaintiffs Have Also Plead Conscious Misbehavior And/or Recklessness

As noted above, Plaintiffs can satisfy the scienter element of a 10(b) claim by pleading strong circumstantial evidence of conscious misbehavior or recklessness.  *Koncelik*, 2010 WL 3910307, at *6 (Daniels, J.).  Here, Plaintiffs allege conscious misbehavior and/or recklessness: Loughlin admitted he knew of the cannibalization issue at the start of the Class Period in March 2011 when Getaways was launched.  *See, e.g.*, *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 482 (S.D.N.Y. 2010) (defendant's admission probative of scienter).  Further, launching Getaways was a significant business decision for Travelzoo as Getaways was a hybrid of the Company's core travel and Local Deals branches.  It is simply inconceivable that the Individual Defendants – particularly high-level officers like Loughlin (CEO) and Lee (CFO), and founder Bartel, were unaware of the launch of Getaways and the effect it would have on core travel revenues and overall growth.  *Cf. In re Gen. Elec. Co. Sec. Litig.* No. 09 Civ. 1951 (RJH), 2012 WL 90191, at *26 (S.D.N.Y. Jan. 11, 2012) ("surely an inference of knowledge may be appropriate, even if not determinative, where it would be absurd to suggest that management was without knowledge of the matter") (citation omitted); *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) ("a strong inference of scienter may…be credited where it is almost

---

[28] Defendants' other authorities fare no better.  *In re AXIS Capital Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 595 (S.D.N.Y. 2006) (noting that cases have found 10%, 11%, and 20% inadequate to support motive allegation; here, Individual Defendants sold 100%, 95% and 22%); *Glaser*, 772 F. Supp. 2d at 593 (only 2 of 5 individual defendants sold; of two who sold, one increased his holdings during the class period and the other sold only $3 million); *In re Apollo Group, Inc. Sec. Litig.*, No. CV-10-1735-PHX-JAT, 2011 WL 5101787, at *10 (D. Ariz. Oct. 27, 2011) (less than half the individual defendants sold, and at 14%, 21%, 26%, and 34%); *In re Health Mgmt. Sys. Inc. Sec. Litig.*, No. 97 Civ. 1865 (HB), 1998 WL 283286, at *68 n.3 (S.D.N.Y. June 1, 1998) (unlike here, "[t]here was no one particular event or events that triggered substantial sales"; in addition, two individuals sold significant amounts after a partial disclosure during the class period, and one defendant *bought* shares); *Ronconi v. Larkin*, 253 F. 3d 423, 435-36 (9th Cir. 2001) (insiders who made most alleged misrepresentations sold only 10% and 17%; plaintiffs provided no significant past trading history for one insider who sold 98%).

inconceivable that an individual defendant would be unaware of the matters at issue").

Moreover, Loughlin admitted he knew of what revenues Getaways had netted within one week

of offering a Getaways deal; and Defendants had access to real-time access to up-to-date revenue

information through software utilized by the Company.  ¶ 61.  These allegations plead a strong

inference of scienter based on conscious misbehavior and/or recklessness.[29]

## IV.  LEAD PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION

To sufficiently allege loss causation, a plaintiff must "plead that the loss was foreseeable

and caused by the materialization of the risk concealed by the fraudulent statement."  *ATSI*

*Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 107 (2d Cir. 2007).  Significantly, the Second

Circuit has held that a disclosure causing a loss does not mean that the misrepresentation itself

must cause the drop in value of the security, but rather that "the risk that caused the loss was

within the zone of risk *concealed* by the misrepresentations and omissions alleged."  *Lentell v.*

*Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005); *see also Alaska Laborer Emps. Ret.*

*Fund v. Scholastic Corp.*, No. 07 Civ. 7402 (GBD), 2010 WL 3910211, at *6 (S.D.N.Y. Sept.

30, 2010) (Daniels, J.) ("[w]hile the alleged corrective disclosure need not precisely set forth the

mechanics of the alleged fraud, they must 'allow a factfinder to ascribe some rough proportion of

the whole loss to' the defendants' supposed misconduct").  In sum, a plaintiff may plead loss

causation without alleging a disclosure that precisely mirrors the substance of a prior undisclosed

---

[29] The resignation of CFO Lee during the Class Period on the heels of massive stock sales by Bartel and Loughlin – including Loughlin's unloading of all his Travelzoo shares – is suspicious in timing and indicative of Lee's scienter. Courts in this District routinely find suspiciously-timed resignations probative of scienter.  *See, e.g.*, *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) ("[A]lthough not sufficient in and of themselves, [resignations] add to the overall pleading of circumstantial evidence of fraud"); *see also Varghese v. China Shenghuo Pharmaceutical Holdings, Inc.*, 672 F. Supp. 596, 608 (S.D.N.Y. 2009); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 52, 534 (S.D.N.Y. 2009); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008); *In re AIG, Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 533 (S.D.N.Y. 2010); *In re Mercator Software, Inc. Sec. Litig.*, 161 F. Supp. 2d 143, 153 (D. Conn. 2001).  Defendants' reliance on *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 447-47 (S.D.N.Y. 2005), on this point is misplaced.  In *BISYS*, the plaintiffs did nothing to counter non-fraudulent reasons for a resignation contained in documents cited in their complaint. Further, Plaintiffs allege a connection between Lee's resignation and the alleged fraud.  *See* ¶ 143.

fraud.  *Take-Two*, 551 F. Supp. 2d at 285.  *See also In re Bristol–Myers Squibb Sec. Litig.*, 00 Cv.1990 (SRC), 2005 WL 2007004, at *20 (D.N.J. Aug. 17, 2005) ("the Second Circuit's holding in *Lentell* cannot ... stand for the general proposition that an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud . . . .").[30]

Thus, analysts can be a connecting link in unfolding the truth about a defendant's misstatements.  For example, in *In re Tronox, Inc. Securities Litigation*, No. 09 Civ. 6220 (SAS), 2010 WL 2835545, at *12 (S.D.N.Y. June 28, 2010), the plaintiffs alleged that Tronox's financial statements failed to record reserves, and the company generally downplayed issues, concerning its environmental liabilities; thus, the concealed risk was that those liabilities would ultimately be greater than reported.  The plaintiffs alleged that disclosure of these liabilities caused stock drops in Tronox – but the corrective disclosures stated that the environmental liabilities were only one of a number of factors.  *See Tronox Cmplt.*, 2009 WL 5213810, at ¶¶ 328, 332, 335 (S.D.N.Y. Nov. 24, 2009).  The defendants argued that the plaintiffs failed to plead loss causation because the cause of the drops was actually the "unprecedented downturn in the . . . housing market." *Tronox*, 2010 WL2835545, at *13.  But the court disagreed:

> [Plaintiffs] allege[] that several analyst reports during the Class Period opined that Tronox's financial troubles were due in part to increased environmental remediation costs – with one report even stating that Tronox's "*larger than-expected* environmental remediation costs and liabilities' were a risk."  At [this] stage, this is enough to make the [loss causation] inference . . . plausible.

*Id*.  Similarly, here, on the conference call with Loughlin the day Travelzoo announced materially lower revenues and earnings, *five* analysts focused on the revenue cannibalization issue in connection with the adverse announcement and two analysts wrote in their reports that

---

[30] Further, a given disclosure need not emanate from a particular source, "take a particular form[,] or be of a particular quality." *Take-Two*, 551 F. Supp. 2d at 282-83 (citation omitted).  Thus, loss causation may be predicated upon brief, publicly-disclosed, third-party analyses of a company's financials, which contradict representations made by defendants.  *Id.* at 283.  *See also In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297 (S.D.N.Y. 2006) (corrective disclosures need not emanate from the company itself, so long as the truth is disclosed in some fashion).

the cannibalization had *caused* the lower overall revenue growth.  That is "enough to make the inference of loss causation plausible."  *Id.*[31]   *See also Scottish Re*, 524 F. Supp. 2d at 395-96 (alleged misstatements related to internal controls; disclosure related to adjustments to financial statements; court upheld loss causation allegations because "analysts remarked that the failures in the Company's internal control system likely prevented the Company from earlier discovery of these problems"); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 166 (S.D.N.Y. 2008) ("Plaintiffs need only plead that Defendants' fraudulent behavior concealed facts or circumstances which, when revealed, *contributed* to the loss.  The Court need not make a final determination as to what losses occurred and what actually caused them") (emphasis added); *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1026 (9th Cir. 2005) (defendants argued disclosure concerned poor financial results but said nothing about improper accounting practices; Ninth Circuit reversed, holding loss causation sufficiently pled where analyst reports noted "*[y]ou have got to question whether they are manufacturing earnings*").

Here, the concealed facts about cannibalization indisputably "contributed to the loss" (*Bristol Myers*, 586 F. Supp. 2d at 166) – as Loughlin concedes (*see* ¶¶ 118-19) and analysts corroborate (*see* ¶¶ 115-127).  Further, as in *Scottish Re*, analysts saw that the lower revenues and the cannibalization were two sides of the same coin.  524 F. Supp. 2d at 395-96.

Defendants claim that the June 1, 2011 announcement of Getaways apprised the market of the revenue cannibalization issue.  This argument falls flat – Defendants announced the *existence* of Getaways on June 1, 2011; they did not disclose the *impact* it would have on overall Travelzoo revenues and growth by cannibalizing core travel.   But the June 1, 2011

---

[31] Moreover, in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court explained that the pleading rules for loss causation were "not meant to impose a great burden upon a plaintiff," and that plaintiffs need only plead "a short and plain statement," pursuant to Fed. R. Civ. P. 8(a)(2), that provides defendants with "some indication of the loss and the causal connection that the plaintiff has in mind."  *Id.* at 346-47 (citations omitted).

announcement is significant because it provided the market with enough background that, when Defendants announced lower revenues on July 21, 2011, the market was able to put two and two together and discern that Getaways was a cause of the lower than expected revenues.

Further, Defendants' claim that Travelzoo stock only fell as a result of the July 21, 2011 press release, is factually wrong.   Travelzoo stock *continued* to fall after the 11:00 a.m. conference call.   *See* Ex. A hereto (showing Travelzoo stock, after opening at $59.39 per share on July 21, 2011 (*see* Musoff Decl. Ex. F), had risen a bit and was trading near $61 at 11:00 a.m. that day).   During and after the conference call, *Travelzoo stock began to fall more*; by noon on July 21, 2011 it had fallen from $61 to $58.   *See* Ex. A.   Travelzoo stock kept falling after the call to close at $56.002.   *See* Musoff Decl. Ex. F.   Thus, the market learned more about Getaways' impact on overall revenues from the conference call.

Regardless, the July 21st announcement and the conference call are pieces of the same puzzle.   The conference call with analysts a few hours after the press release was disseminated unfolded a substantial cause of the lower revenues – cannibalization of revenues by Getaways. The two are not mutually exclusive.   Thus, Defendants' citation to *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 365 (S.D.N.Y. 2008), on this point is not helpful.   Unlike *Merrill Lynch*, there were no "intervening events" causing Travelzoo stock to drop.   There was one event – the second quarter revenue and earnings announcement, which analysts (and Loughlin) linked to the revenue cannibalization.

Defendants' also misframe the issue – again – as whether the July 21st announcement disclosed a "scheme" to expand the Company's voucher business at the expense of core travel. That is not what Plaintiffs allege; Plaintiffs allege Defendants omitted to disclose that internal

competition would cause revenue cannibalization, and that the Company's revenue growth would be less than expected as a result of such cannibalization.[32]

## V.    THE SAFE HARBOR DOES NOT INSULATE DEFENDANTS FROM LIABILITY

Defendants claim their risk statements immunize them from liability as to their alleged omissions about Getaways' negative impact on overall growth – but their statements do not come close to "meaningful cautionary language" (15 U.S.C. § 78u-4) apprising investors of  the specific material risks at issue.[33]  For example, Defendants highlight their statement that "[o]ur inability to expand our operations in an efficient manner could cause our expenses to grow disproportionately to revenues, our revenues to decline or grow more slowly than expected and could otherwise have a material adverse effect on our business."  Def Mem. at 21.[34]  These statements fail to disclose that Getaways was *already* cannibalizing core travel revenue.

The Second Circuit has held that "[t]o avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information."  *See Slayton v. Am. Express*

---

[32] *Alaska Laborer*, 2010 WL 3910211, at *7, is inapplicable because, there, this Court held that the allegedly misstated facts *had* been previously disclosed.  Further, in *Alaska*, other misstatements related to "entirely different business units" than the ones complained of.  *Id.* at *6.  Defendants' other authorities are also inapplicable.  *See Eastman Kodak*, 2006 WL 3149361, at *8 n.2 (defendants *had* announced the purported cause years earlier); *Teachers' Ret. Sys. of La v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007) (same); *Avon*, 2009 WL 848017, at *25 (allegedly concealed facts substantively discussed – including by analysts – before the class period).

[33] Defendants do not argue the safe harbor immunizes them from liability as to their statements about competition.  And for good reason.  As discussed above, Defendants recently changed their risk language markedly, now covering the danger of competition within different Travelzoo branches.

[34] Other examples of Defendants' risk statements also failed to address the real risk, namely, that Getaways would cannibalize revenue from core travel to the Company's overall detriment: "[T]here is no assurance that we will continue to be profitable in the future[;]" "If our revenues grow at a slower rate than we anticipate, or if our spending levels exceed our expectations or cannot be adjusted to reflect slower revenue growth, we may not generate sufficient revenues to be profitable."  *See* Defs. Mem. at 21 n.11.  General, boilerplate risk language cannot be characterized as meaningful, cautionary language.  *See, e.g.*, *Dodona I, LLC v. Goldman, Sachs & Co.*, No. 10 Civ. 7497 (VM), 2012 WL 935815, at *17 (S.D.N.Y. Mar. 21, 2012).

*Co.*, 604 F.3d 758, 772 (2d Cir. 2010).[35]  Defendants' warnings were not "meaningful" because they did not "convey substantive information" (*Slayton*, 604 F.3d at 771) about Getaways' eating into core travel revenues and adverse impact on overall revenue growth and failed to disclose a risk that had transpired (*Rombach*, 355 F.3d at 173) – which Loughlin knew of in March 2011.[36]

In addition, the inadequacy of Defendants' risk language is highlighted by the change Defendants effected after the Class Period.  Defendants – for the first time – specifically warned of revenues being shifted from one branch (Getaways) to another (core travel) with the risk of *less revenue*.  *See supra* at 20-21.  In Defendants' cited Second Circuit case, *Slayton*, 604 F.3d at 772, the safe harbor did not apply because the defendants did not warn of "the exact risk".

Finally, Defendants again misstate the issue.  The issue is not whether investors were misled "into believing that Travelzoo had issued an unequivocal promise of growth."  Defs. Mem. at 22.  The issue is whether it was misleading for Defendants to specifically discuss Local Deals as a driver of growth without disclosing that Local Deals' Getaways branch was negatively impacting overall growth by cannibalizing revenue from the Company's core travel branch.[37]

---

[35] *Cf. Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("[c]autionary words about future risk cannot insulate from liability the failure to disclose that *the risk has transpired*") (emphasis added); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("[t]o warn that the untoward may occur when the event is contingent is prudent; to caution….it is only possible…when [it has] already occurred is deceit")

[36] *Cf. In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d at 495 (S.D.N.Y. 2011) ("To be meaningful, a cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil."). (Citation and internal quotation marks omitted.)  Further, Defendants' failure to disclose existing and historical facts relevant to growth; namely, Getaways' cannibalization of core travel revenues and resulting impairment of overall growth, takes Defendants' omissions outside the ambit of the safe harbor.  *See Oxford Health*, 187 F.R.D. at 133, 141 ("[P]laintiffs point out that they are not relying on the falsity of Oxford's financial projections and estimates, but rather the defendants' failure to disclose historical and existing material facts about Oxford's computer problems and the impact of those problems on the reliability of the financial statements. The safe harbor and bespeaks caution doctrines do not apply to these omissions"); *Vivendi*, 765 F. Supp. 2d 512, 569-70 ("the misleading nature of the statement could be verified the moment it was made").

[37] Defendants' citations to cases dealing with the safe harbor provision are all factually distinguishable.  *In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*, No. 08-Civ.-11218 (DLC), 2009 WL 4823923, at *14 (S.D.N.Y. Dec. 14, 2009) (statement on growth inactionable where "plaintiffs [did] not even explain how these statements of expectation about revenue growth . . . are false"); *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *5 (S.D.N.Y. Nov. 25, 2003) (defendants' statement that they were "confident in [their] ability to achieve . . . sales and earnings targets" were not "guarantees"); *Wilson v. Merrill Lynch & Co.*, No.

## VI.   *JANUS* IS A RED HERRING

Defendants cite *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2304-05 (2011), which concerns what it means to "make" a statement under the federal securities laws.  But "[t]here is no dispute that [defendants] who signed [statements] 'made' the statements under *Janus*." *EnergySolutions*, 814 F. Supp. 2d at 417.  Here, every defendant signed at least one statement.  *See* ¶ 67.  Thus, Urso's claim (Urso Mem. at 7) – for which she cites not one case – that she is not responsible for the statement she signed is simply wrong.[38]

## VII.   PLAINTIFFS ADEQUATELY PLEAD CONTROL PERSON LIABILITY

This Court has held that "[t]o establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Sanofi-Aventis*, 774 F. Supp. 2d at 573.  *In Sanofi*, this Court found the plaintiffs had sufficiently alleged 20(a) claims against two defendants who were "decision-makers" and who had made statements.  Here, Loughlin was clearly a "decision-

---

10-1528-cv, 2011 WL 5515958, at *10 (2d Cir. Nov. 14, 2011) (plaintiffs' claim that cautionary statement that Merrill "may routinely" place bids was misleading when it did so in every auction was rejected because plaintiffs' complaint did not factually support such claim).

[38] Further, as for Individual Defendants who did not sign a certain statement, the group pleading doctrine, which "allows plaintiffs to rely on a presumption that statements in . . . annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company" (*In re Van der Moolen Holding N.V. Sec. Litig*, 405 F. Supp. 2d 388, 399 (S.D.N.Y. 2005) (citation and internal quotation marks omitted)), is still accepted by many courts in this District.  As recently noted in *Warchol v. Green Mountain Coffee Roasters, Inc.*, No. 210-cv-227, 2012 WL 256099, at *5 n.9 (D. Vt. Jan. 27, 2012), "[d]istrict courts have continued to apply [the group pleading doctrine]."  (Citing *Van der Moolen*, 405 F. Supp. 2d at 399 ("The majority rule in this district is that the group pleading doctrine has survived the PSLRA.")). *See also S.E.C. v. Landberg*, No. 11 civ. 0404 (PKC), 2011 WL 5116512, at *6 (S.D.N.Y. Oct. 26, 2011) (applying group pleading if a defendant has made a misstatement with scienter); *Lehman Bros.*, 799 F. Supp. 2d at 276 n.106 (chief operating officer who "oversaw the day-to-day management" liable under group pleading); *Bear Stearns*, 763 F. Supp. 2d at 485 ("[b]ecause the Individual Defendants here are all Directors or Officers . . . with direct involvement in the everyday affairs of the Company, the group pleading doctrine applies . . . ").  Plaintiffs allege each of the Individual Defendants (two of whom are high-level officers, CEO (Loughlin) and CFO (Lee)), were provided with each alleged misstatement before signing.  ¶ 29.  Thus, the Individual Defendants, who, like the defendants in *Bear Stearns* are all officers and directors of Travelzoo, should be held liable under group pleading even for statements they did not say or sign.

maker" – he appeared on *Mad Money*, made numerous misstatements, was quoted in the April press release, and was the main spokesman on conference calls.  *See* ¶¶ 75, 85, 99; Musoff Decl. Ex. 3.  Indeed, every Individual Defendant signed an allegedly misleading statement, and this Court, as well as others in this District have found that signing an allegedly misleading document is probative of control person liability.  *See Sanofi-Aventis*, 774 F. Supp. 2d at 572 (finding control person liability where each defendant "made an allegedly fraudulent statement" and had "knowledge of or access to the omitted facts").[39]  In addition, "a controlling person's receipt of financial benefits can demonstrate culpable participation."  *In re Blech Sec. Litig.*, No. 94 civ. 7696 RWS, 2002 WL 31356498, at *21 (S.D.N.Y. Oct. 17, 2002); *Oxford Health*, 187 F.R.D. at 143.  Here, Loughlin, Urso, and Bartel reaped such benefits from their stock sales.  Finally, as alleged in the derivative complaint, Bartel was intimately involved in the day-to-day running of the Company.  *Cf. In re Travelzoo Inc. Shareholder Deriv. Litig.*, Case No. 11-6125-GBD (S.D.N.Y. Jan. 6, 2012), Dkt No. 25 at ¶ 129 (nothing went on at Travelzoo without Bartel's approval).  That is enough to sufficiently allege the Individual Defendants' 20(a) liability.

## CONCLUSION

For all these reasons, Defendants' motions to dismiss should be denied in their entirety.

Dated:   April 11, 2012
         New York, New York

**BERNSTEIN LIEBHARD LLP**

/s/
_____
Sandy A. Liebhard (liebhard@bernlieb.com)
Jeffrey M. Haber (haber@bernlieb.com)
U. Seth Ottensoser (ottensoser@bernlieb.com)
Joseph R. Seidman, Jr. (seidman@bernlieb.com)
10 East 40th Street, 22nd Floor
New York, NY 10016
Telephone:  (212) 779-1414

---

[39] *See also In re Alstom SA*, 406 F. Supp. 2d 433, 487 (S.D.N.Y.2005); *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429,457 (S.D.N.Y. 2005).

Facsimile:    (212) 779-3218

**Lead Counsel for Lead Plaintiffs and the
Proposed Class**

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2012, I served all counsel of record listed below with

the attached document via email and the ECF filing system.

Rachel J. Barnett
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036-6522

Adam S. Hakki
Shearman & Sterling
599 Lexington Avenue
New York, New York 10022-6069

/s/ Joseph R. Seidman, Jr.
JOSEPH R. SEIDMAN, JR.