UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
:
:
:
:
IN RE TRAVELZOO INC.                :         MEMORANDUM DECISION
SECURITIES LITIGATION               :         AND ORDER
:
:         11 Civ. 5531 (GBD)
:         11 Civ. 6845 (GBD)
:
:
:
------------------------------------- x

GEORGE B. DANIELS, United States District Judge:

Lead Plaintiffs Michele Minnick and Jan Frazer ("Plaintiffs") bring this consolidated class action on behalf of all those who purchased securities of Travelzoo Inc. ("Travelzoo") between March 16, 2011 and July 21, 2011 (the "Class Period"), against Travelzoo and several of its officers and board members[1] (collectively, "Defendants") for securities law violations. Plaintiffs allege that Defendants violated Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Securities Exchange Act of 1934 by making materially misleading statements and omitting crucial facts about the impact of Travelzoo's newly-launched Local Deals Getaways ("Getaways") business on the company's core business growth and revenues. Defendants move to dismiss the Consolidated and Amended Class Action Complaint ("CAC") for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Section 9(b) of the Private Securities Litigation Reform Act of 1995 ("PSLRA").[2] Defendants' motions are GRANTED.

---

[1] The officers and board members are: Ralph Bartel, Travelzoo's Founder and a member of the Board of Directors; Christopher J. Loughlin, Travelzoo's Chief Executive Officer; Wayne Lee, Travelzoo's Chief Financial Officer during part of the Class Period; and Kelly Urso, a member of Travelzoo's Board of Directors (collectively, the "Individual Defendants").
[2] Defendant Urso independently filed a separate motion to dismiss (ECF No. 44).

1

# BACKGROUND[3]

## I. The Parties

Travelzoo was founded in 1998 and operates as a global Internet media company that informs over 23 million subscribers and website users about travel, entertainment, and local deals from thousands of businesses. CAC ¶¶ 3, 37. Its revenue is primarily derived from its core travel business, which receives advertising and listing fees for publishing e-mail newsletters that offer discounted travel deals from companies such as American Airlines, United Airlines, Starwood Hotels & Resorts Worldwide, Fairmont Hotels and Resorts, and Marriott Hotels. CAC ¶¶ 4, 40. From 2002 to 2010, Travelzoo's annual revenues grew from $9.9 million to $112.8 million, and its net income increased from $850,000 to $13.2 million. CAC ¶ 12.

In 2010, Travelzoo launched its Local Deals product ("Local Deals"), which offers discounted vouchers from restaurants, spas, and entertainment businesses that are local to its subscribers. Unlike its core travel business, which earned income upfront through advertising and listing fees, Local Deals generated revenue when the deal vouchers were purchased. After the merchant was paid approximately 60-70% of the voucher's value, the remainder would be paid to Travelzoo. CAC ¶ 4. Between its first and second quarter of operations, Local Deals' gross revenues grew approximately 1000%. *Id.*

In March 2011, Travelzoo tested its Getaways product, which operated as a hybrid of Travelzoo's core travel business and its Local Deals product. CAC ¶¶ 5, 52. Unlike other Local Deals, Getaways typically offers a hotel stay along with a spa or restaurant deal, often within driving distance or a short flight from the subscribers' homes. *Id.* It targets subscribers in specific markets who may not have otherwise considered paying for a meal and a stay at a local

---

[3] The following factual allegations are taken from the complaint (or documents attached to it or incorporated by reference) and are deemed to be true for the purposes of a motion to dismiss. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

2

hotel. CAC ¶ 55.

Defendant Ralph Bartel is the founder of Travelzoo and has served as a Director since July 2010. CAC ¶ 24. Previously, he served as the Chairman of Travelzoo's Board of Directors from May 1998 to June 2010, and Chief Executive Officer and President from May 1998 to September 2008. *Id.* Defendant Christopher J. Loughlin has served as Travelzoo's Chief Executive Officer since July 2010. Prior to that, he served as Executive Vice President, Europe since May 2005. CAC ¶ 25. Defendant Wayne Lee was Travelzoo's Chief Financial Officer during part of the Class Period. He was replaced by Glen Ceremony in May 2011. CAC ¶ 26. Defendant Kelly Urso has served as a director of Travelzoo since February 1999. CAC ¶ 27.

## II. Travelzoo's Allegedly Fraudulent Conduct During the Class Period

Plaintiffs allege in the CAC that Defendants perpetrated a fraud to convince investors through material misstatements[4] and omissions that Travelzoo's growth and bottom line revenues would not be adversely affected by the launch and operation of Getaways, even as they were aware that Getaways was cutting into the profits that Travelzoo would have made through its core travel business.[5] Plaintiffs contend that these misstatements and omissions rendered various statements about growth and competition made by Travelzoo (and Defendant Loughlin on behalf of Travelzoo) in annual and quarterly financial reports, press releases, and conference calls, false and misleading.

On March 16, 2011, Travelzoo issued its annual report on Form 10-K for the 2010 fiscal

---

[4] Plaintiffs subsequently clarified in its opposition brief and during oral argument that their allegations were not based on any affirmative misstatements, but rather solely on material omissions that allegedly made Defendants' statements false and misleading. *See* Oral Arg. Tr., p. 78.
[5] In light of the limited number of available rooms, hotels could not offer an unlimited number of deals, and thus a Getaways deal for a local hotel could be at the expense of a deal offered at the same hotel advertised or listed through Travelzoo's travel branch. CAC ¶ 57. Thus, in the event that the revenue Travelzoo earned through Local Deals Getaway vouchers at a certain hotel amounted to less than what it could have earned through advertising and listing fees had the hotel used its core travel business, its net revenue from that hotel would be lower than if the hotel had offered rooms through the travel business.

year ("2010 Annual Report").[6] CAC ¶ 67. The report included statements about Travelzoo's competition from companies including: MSN, Yahoo!, Expedia, and Priceline, which offer listings and other advertising opportunities; Google and Bing, which offer pay-per-click listings; Kayak and other travel meta-search engines; Groupon and LivingSocial, which sell vouchers for deals from local businesses; and traditional media companies, including newspapers and magazines, which provide advertising opportunities through their websites. *Id.* Noting the longer operating histories, greater resources, larger advertiser bases, and new technologies of its competitors, Travelzoo warned that such competition could adversely affect its competitive position, resulting in reduced margins, loss of market share, or less use of its products by advertisers and consumers. *Id.* The report included similar cautionary language in discussing the critical importance of advertising revenues and the risk factors involved in Travelzoo's business model. CAC ¶¶ 69, 71. The 2010 Annual Report also stated Travelzoo's desire to grow:

> Since the commencement of our operations, we have experienced a period of rapid growth. In order to execute our business plan, we must continue to grow significantly.
>
> We want to grow our revenue and operating profit through expanding the Travelzoo product offerings and content into entertainment (e.g., Broadway shows, sporting events), through our Local Deals e-mail alert service and through Fly.com.

CAC ¶¶ 73, 76.

On April 21, 2011, Travelzoo announced its financial results for the first quarter of 2011. CAC ¶ 78. It reported revenue of $37 million (a 30% increase year-over-year), net income of $6.9 million (up 144% year-over-year), and earnings per share of $0.37 (which increased by $0.22 from the prior year period). Travelzoo also reported an operating profit of $10 million. *Id.* The press release included quotes from Loughlin, who stated that "[Travelzoo] kicked off 2011

---

[6] The report was signed by Defendants Bartel, Loughlin, Lee, and Urso, and it was certified by Defendants Loughlin and Lee. CAC ¶ 67.

4

with record revenues" and "doubled adjusted operating income year-over-year as [Travelzoo] continued to ramp up Local Deals, which are now live in 48 markets in 6 countries." CAC ¶ 79.

On the same day, Travelzoo presented its "First Quarter Performance and Growth Strategy Overview" to analysts on a conference call. In the presentation, which Travelzoo also posted to its website, the company noted that management would focus on "[r]apidly grow[ing] Local Deals revenues [and] income", in part by "[i]ncreas[ing] revenue per market." CAC ¶ 81.

Loughlin also made the following comments about Travelzoo's growth strategy on a conference call with analysts:

> Along the X axis, we are growing the number of subscribers that engage with the Travelzoo brand. We show our second-highest increase in new subscribers in Q1 2011 and now have just under 20 million subscribers to our publications in Europe and North America.
>
> Along the Y axis, we are growing the revenue per subscriber, and Local Deals has become a substantial driver here. You can see already that we increased our revenue per subscriber from $6.70 to $7.80 from Q4 and Q1...."

CAC ¶ 85. Travelzoo's shares continued to rise after Travelzoo's announcement of its first quarter 2011 financials. CAC ¶ 87.

On May 10, 2011, Travelzoo issued its annual report on Form 10-Q for the First Quarter of 2011.[7] CAC ¶ 92. The report contained virtually the same cautionary language about the potential impact of Travelzoo's competitors on its growth as the 2010 Annual Report. *Id.* It also stated that "[Travelzoo's] total revenues increased to $37.0 million for the three months ended March 31, 2011 from $28.5 million for the three months ended March 31, 2010" and attributed the growth, in part, to the Local Deals e-mail alert service. CAC ¶ 94. Finally, the report indicated Travelzoo's desire to continue to grow through international expansion and by expanding the scope of Travelzoo's business. CAC ¶ 96.

---

[7] The form was signed by Defendant Lee and certified by Defendants Lee and Loughlin. CAC ¶ 92.

On May 16, 2011, Travelzoo issued another press release about Local Deals, which stated that "[g]ross sales of Local Deals in Europe, halfway through the second quarter, are only $400,000 shy of the total gross revenues for the entire first quarter." The press release quoted Loughlin, who stated, "We are pleased to see the rapid adoption of Local Deals among our European subscribers." CAC ¶ 100.

On June 1, 2011, Defendants published a press release where Travelzoo mentioned Getaways for the first time. CAC ¶ 105. The press release included the following language:

> Travelzoo... announced today that 40 upscale resorts have sold more than 28,000 incremental room nights through its new Travelzoo Getaways program.
>
> Travelzoo Getaways uses the same booking mechanism as Travelzoo Local Deals, where Travelzoo subscribers purchase a voucher from the resort through the Travelzoo website and then book their stay directly with the property.

*Id.*

Travelzoo issued yet another press release about Local Deals and Getaways on June 8, noting that "[g]iven the success [of Local Deals in Hong Kong], more Local Deals have been launched in Hong Kong, including Getaway packages with the Kantary Beach Hotel Villas and Suites in Thailand and Hotel Royal in Macau." CAC ¶ 107.

Plaintiffs contend that each of the aforementioned statements constitutes actionable omissions that fail to disclose material information about the adverse impact that Getaways had on Travelzoo's growth and revenue. They also allege that, while withholding this information, Defendants sold their stock shares at artificially inflated prices throughout the Class Period. CAC ¶ 89. On April 25, 2011, Urso sold $9,000 worth of stock in two separate sales. CAC ¶ 138. Between April 26 and April 29, 2011, Bartel alone and/or through entities he controlled, sold more than 625,000 shares for a profit of over $55 million. *Id.* On May 2, 2011, Loughlin sold 100% of his shares and made a profit of over $1 million. CAC ¶ 90. Between May 25 and

May 31, 2011, Bartel sold approximately 920,000 more shares for proceeds of approximately $68 million. CAC ¶ 103. Between June 1 and June 15, 2011, he sold approximately 900,000 additional Travelzoo shares for approximately $61 million. CAC ¶ 109. Defendant Lee did not sell any stock during the Class Period.

### III. July 21, 2011 Announcement and Alleged Corrective Disclosure

On July 21, 2011, Travelzoo issued a press release reporting its financials for the second quarter of 2011. CAC ¶ 112. Despite announcing revenues of $37.6 million (a 34% increase year-over-year), an operating profit of $7.6 million (a 29% increase year-over-year), and net income per share of $0.30 (an increase of $.10 from the prior-year period), the results fell below analyst estimates, which predicted $40.2 million in revenue and earnings per share of $0.38. *Id.* Travelzoo shares dropped by 30 percent after the announcement, from $90.00 per share to $60.00 per share. CAC ¶ 114.

Upon being asked by an analyst during a conference call why core business growth "disappear[ed] or flatten[ed] out in the quarter", Loughlin responded:

> One thing, which we did this quarter as you can see we launched [a] product called Getaways, which we tested in March. That did create a little bit of cannibalization and confusion, where it moved [] hotel revenue from advertising to a voucher model.

CAC ¶ 118.

In response to another analyst's question about whether Getaways would be the likely explanation for lower revenue in segments of the travel business, Loughlin answered:

> Yeah, I think... that's actually a reasonably good assumption, I mean obviously it's not the whole picture, but we took a decision back in April. We ran a test in April – actually ran a test in March for the Getaways. And some folks will probably remember there was a Napa Valley deal that all of [a] sudden went through the roof. And we just said to ourselves, okay, do we attack ourselves, or do we just ignore this, and what we did is that right, let's roll it out, see what happens.

CAC ¶ 119. He also noted:

7

> So I mean it's really quite early still what we see it seems to work very, very well for the local drive market and that's a need we haven't really serviced in the past. So to some degree, there is cannibalization, but also the traditional Travelzoo business is about getting you to fly from San Francisco to New York and stay in a hotel. But what we're not going to do Getaways to send the person sitting in San Francisco and getaway to New York, certainly not yet. So that's why there is no cannibalization.
>
> When you run a Getaway, you don't know what happen[s] until next week.... "[d]o you then say, okay I am willing to replace the hotel advertising solution with this Getaway solution for a particular spa in the top 20. You honestly don't know the answer until the week from the day you do it.

CAC ¶¶ 78; 120, 121.

Plaintiffs allege that the totality of Loughlin's statements during the conference calls discloses for the first time that: i) Getaways was cutting into the core travel business's growth; and ii) that Defendants knew within a week of launching Getaways that this internal competition would affect Travelzoo's overall growth and revenues. Pl.'s Mem. at 1. They contend that the omission of these facts rendered their previous statements about growth and competition misleading by providing an incomplete view of the company's financial situation to investors and analysts. Plaintiffs do not, however, not contend that any of Travelzoo's reported financial results were false or inaccurate.

## STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombley*, 550 U.S. at 555.

The task of the court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks and citation omitted). The court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiffs favor. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In deciding a motion to dismiss, the Court is not limited to the face of the complaint. The court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns v. Shaar Fund. Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## SECURITIES ACTION

### I.  Section 10(b) Claim

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." *15 U.S.C. § 78j(b)*. SEC Rule 10b-5, 17 C.F.R. § 240.10b-5(b), states that it "shall be unlawful for any person...[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." To state a claim in a private action under section 10(b) and Rule 10b-5, a plaintiff must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission [or transaction causation]; and (5) economic loss; and (6) loss

causation." *Stoneridge Inv. Partners, L.L.C. v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (citing *Dura Pharms., Inc. V. Broudo*, 544 U.S. 336, 341-42 (2005)); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

## A. Material Omissions

Plaintiffs contend that Travelzoo's failure to disclose the internal competition between its core business and Getaways rendered several of its statements about growth and competition in its financial reports, press releases, and conference calls false and misleading. An omission is actionable where: (i) the omitted fact is material; and (ii) the corporation has a duty to disclose the omitted fact. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Id.* at 239 n. 17. In making a determination about whether a particular omission is actionable, the Court must determine whether such information was necessary in light of the context, manner of presentation, and language of the statements at issue "so that what was revealed would not be so incomplete as to mislead." *In re Bristol Myers Squibb Co. Secs. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) (citation omitted).

The materiality requirement is satisfied if "a reasonable investor would have considered [the omitted fact] significant in making investment decisions." *Ganino*, 228 F.3d at 161; *see also Basic*, 485 U.S. at 231-32 (describing materiality as an issue of whether the omitted fact significantly alters the total mix of information available) (quoting *TAC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Plaintiffs fail to plead with sufficient particularity that the internal competition between Getaways and Travelzoo's core travel business is material. The mere existence of this so-called "cannibalization" between two products or businesses within the same company does not, by

10

itself, constitute information a reasonable investor would have considered significant in making an investment decision. Cannibalization is not a factual statement about the condition of a company that necessarily affects that company's stock. Since overlap between two segments of a company does not automatically lead to loss of overall revenue for a company, Plaintiffs must plead with sufficient particularity how the cannibalization between Getaways and Travelzoo's core business adversely affected Travelzoo's financial situation in a way that rendered Defendants' statements about the financial condition of the company misleading at the time they were made. Plaintiffs' attempt to establish such a connection amounts to nothing more than a conclusory allegation based on Loughlin's July 21 statements after the announcement of its financials for the second quarter of 2011, and the corresponding decline in Travelzoo's stock prices when the company failed to meet analysts' expectations.

Travelzoo had no duty to disclose a *potentially* adverse effect that the launch of one of its products could have on the overall growth and revenue of its other core business. *See In re Citigroup, Inc. Secs. Litig.*, 330 F. Supp. 2d 367; *In re Ford Motor Co. Secs. Litig.*, 184 F. Supp. 2d 626, 633 (E.D. Mich. 2001) (concluding that a company had no duty to disclose information about possible recall of tires because there is "no duty to disclose predictions that are not substantially certain to hold.").

Plaintiffs also fail to establish that Travelzoo had a duty to disclose the cannibalization because they do not plead that Travelzoo knew or should have known that the company would not meet their own overall growth and revenue projections. Indeed, Plaintiffs concede not only that Travelzoo never offered its own projections, but that the company did grow and profit significantly. Rather, their primary contention is that Defendants should have been aware, and should have disclosed, that they would not meet *analysts'* estimates due to the cannibalization.

11

"Disclosure of an item of information is not required ... simply because it may be relevant or of interest to a reasonable investor. For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information." *Resnik v. Swartz*, 303 F.3d 147; *see In re Time Warner Inc.*, 9 F.3d at 267 ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."). As Defendants did not "sufficiently entangle[] [themselves] with the analysts' forecasts" or "place its imprimatur, expressly or impliedly, on the analysts' projections", they did not owe a duty to correct or modify the analysts' projections. *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156.

The Second Circuit has routinely held that "[t]he securities laws were not designed to provide an umbrella cause of action for the review of management practices, nor is 'fraud by hindsight' a viable basis upon which to challenge management practices that ultimately result in losses." *In re Citigroup, Inc. Secs. Litig.*, 330 F. Supp. 2d at 377 (citing *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)). Plaintiffs cannot allege fraud simply because Travelzoo failed to meet the expectations of analysts and investors, which therefore resulted in the decline of stock prices. Accordingly, Plaintiffs' fail to plead with sufficient particularity that Defendants' omissions about the cannibalism between Getaways and Travelzoo's core travel business were material or in violation of their duty to disclose.

### B. Scienter

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead, *inter alia*, that each defendant "acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. V. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976)). On a motion to dismiss, the court must "consider the complaint in its entirety," inquiring "whether all of the facts alleged, taken

12

collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* At 323. "[A] court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* At 324. "A complaint will survive... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* A plaintiff can satisfy this requirement by "alleging [particularized] facts (1) showing that the defendant had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehaviour or recklessness."[8] *ATSI Commc'ns, Inc.*, 493 F.3d at 99; *see also* 15 U.S.C. § 78u-4(b)(2) (PSLRA requirement to "state with particularity facts giving rise to a strong inference that the defendant acted with the required mental state, scienter.").

### 1. Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

Plaintiffs assert that they have sufficiently pleaded strong circumstantial evidence of conscious misbehavior or recklessness by virtue of Loughlin's July 21, 2011 admission that he was aware that Getaways was cannibalizing Travelzoo's core travel business at the beginning of the Class Period in March 2011, when Getaways was launched. Pl.'s Mem. at 27. It is not enough, however, for Plaintiffs to merely allege that Defendants were aware that there was some level of cannibalization between Travelzoo's core business and Getaways. They must also allege, as discussed *supra*, particularized facts creating a strong inference that Defendants were aware of Getaways' immediate negative impact on Travelzoo's overall revenues and overall growth. They fail to do so.

---

[8] Recklessness exists where the conduct is "highly unreasonable" and "represents an extreme departure from the standards of ordinary care" in light of the fact that "the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142 (quoting *Carter –Wallace I*, 220 F.3d at 39); *Novak*, 216 F.3d at 308. "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendant's knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142 (quoting *Novak*, 216 F.3d at 308).

Upon careful consideration, none of Loughlin's statements during conference calls with analysts can be reasonably construed to be an admission that he, or any of the other Individual Defendants, knew that cannibalization between Travelzoo's core travel business and Getaways had already had an adverse financial impact on the company's growth and revenue at the time when the alleged material omissions were made. To support their claim, Plaintiffs rely on several statements Loughlin made on July 21, 2011 to allege that Defendants had previous knowledge about the adverse effect that Getaways had on Travelzoo as a whole. They specifically point to Loughlin's statement that Getaways was first tested in March, in addition to his following statement about the Getaways' impact:

> [W]hen you run a Getaway, you don't know what happen [sic] until next week. Right? So I mean that – and do you then say, okay I am willing to replace the hotel advertising solution with this Getaway solution for a particular spa in the top 20. You honestly don't know the answer until the week from the day you do it.

Plaintiffs highlight this statement to allege that Loughlin knew within a week of the March Getaways test that Getaways would have an adverse impact on Travelzoo's overall growth and revenue. While this statement does imply that Travelzoo would have some indication within a week of launching a particular Getaways deal whether to strategically offer the deal through its core travel business or through Getaways, it does not offer any information about whether there would be any cannibalization that would affect Travelzoo's overall growth and revenue.

Furthermore, Plaintiffs' bald assertion that Defendants were made aware of Getaways' adverse impact on Travelzoo's overall revenue and growth through software providing "real-time access to up-to-date revenue information" does not meet the standard of particularity required by the PSLRA. Thus, an allegation that Defendants merely had access to revenue information, without further support, cannot survive a motion to dismiss. *San Leandro*, 75 F.3d at 812 ("Plaintiffs' unsupported general claim of the existence of confidential company sales

14

reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss."); *see Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 365 (1st Cir. 1994) (requiring Plaintiffs to "specifically identify the internal reports and the public statements underlying their claims, providing names and dates").

Plaintiffs fail to identify whether any of the Individual Defendants accessed, or even had access to, the revenue information generated by the company's software. *See Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993) ("Plaintiffs' references to unreleased or internal information that allegedly contradict[s] [their] public statements" constituted a failure to plead particular facts because they "[do] not indicate who prepared the projected figures, when they were prepared, how firm the numbers were, *or which [company] officers reviewed them.*" (emphasis added)). More importantly, Plaintiffs do not specify whether the revenue information established that Travelzoo's revenues and growth were being adversely affected by Getaways.

For similar reasons, Plaintiffs' contention that it would be "simply inconceivable that the Individual Defendants – particularly high-level officers like Loughlin (CEO) and Lee (CFO), and founder Bartel, were unaware of the launch of Getaways and the effect it would have on core travel revenues and overall growth" is unpersuasive. Pl.'s Mem. at 27. In light of Plaintiffs' inability to plead with sufficient particularity that the effect of cannibalization on Travelzoo's overall revenue and growth was readily determinable at the time the alleged omissions were made, this allegation cannot withstand a motion to dismiss.

2. *Motive and Opportunity*

Notwithstanding their failure to allege facts constituting strong circumstantial evidence of conscious misbehavior and recklessness, Plaintiffs may still establish scienter by alleging facts to show that Defendants had both a motive and opportunity to commit fraud. To plead a theory of

15

motive, a plaintiff must allege "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Opportunity consists of the "means and likely prospect of achieving concrete benefits by the means alleged." *Id.*

In alleging motive and opportunity, Plaintiffs point to the "pattern and suspicious nature" of stock sales by three of the four Individual Defendants before and during the Class Period. Specifically, Plaintiffs allege that Bartel, who sold 22% of his Travelzoo shares for $186 million in several separate sales, Loughlin, who sold 100% of his stock on May 2, 2011, and Urso, who sold 95% of her stock on April 25, 2011, traded on inside information to sell millions of dollars worth of Travelzoo shares during seven weeks of the Class Period.

"The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." *In re Scholastic Corporation Secs. Litig.*, 252 F.3d 63 (2d Cir. 2001); *see Novak*, 216 F.3d at 307-08. "Unusual" insider sales of stock occurring near the time when the allegedly material omissions were made "may permit an inference of bad faith and scienter." *In re Scholastic Corporation*, 252 F.3d at 74. *See Acito v. Imcera Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). "Insider sales have been found unusual based on a variety of factors, including the amount of profit sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *Rothman*, 220 F.3s at 94 (internal citations omitted).

Plaintiffs allege that Bartel's sales of $186 million worth of Travelzoo stock is suspicious in light of both the total value of his proceeds and the fact that he had not sold any shares in four and a half years prior to those sales. The Second Circuit has determined that "large volume trades may be suspicious but where a corporate insider sells only a small fraction of his or her

16

shares in the corporation, the inference of scienter is weakened." *Rothman v. Gregor*, 220 F.3d 81, 95 (2d Cir. 2000). Despite the exceedingly large profit reaped by Bartel from selling his shares, he retained 78% of his total stockholdings. *In re KeySpan Corp. Secs. Litig.*, 383 F. Supp. 2d 358, 383 F. Supp. 2d 358, 384-85 (E.D.N.Y. 2003) (a sales of less than twenty percent of holdings insufficient to establish scienter). Likewise, despite the unusual nature of Loughlin's May 2, 2011 sale, through which he sold 100% of his stock during the class period, despite never having sold a single share prior to that time, the total value of the sale amounted to only $1 million. While Urso sold 95% of her stock, Plaintiffs fail to adequately plead that her sale was inconsistent with her prior trading practices.[9] There is no allegation that Defendant Lee sold any stock. Thus, while isolated factors of the Individual Defendants' respective sales certainly give rise to suspicion, the totality of the circumstances does not give rise to scienter.

### C. Loss Causation

"Loss causation... is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt. V. Stonepath Group*, 343 F.3d 189, 197 (2d Cir. 2003); *accord Dura Pharms*, 544 U.S. at 342. "[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original). "[T]o establish loss causation, a plaintiff must allege...that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e. that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)) (internal quotation marks omitted); *id.* at 173-75. At the pleading

---

[9] Urso sold half her stock before the commencement of the Class Period.

17

stage, a plaintiff must identify a corrective disclosure – that is, a statement that "reveal[s] to the market the falsity of prior recommendations" – and a resultant drop in the relevant stock's price. *Id.* at 175 n.4.

The July 21, 2011 statements do not qualify as a corrective disclosure. The statements alone do not reveal the falsity of any prior statements made by Defendants. Travelzoo announced the Getaways business approximately seven weeks prior to the alleged corrective disclosure. Furthermore, Loughlin's specific comments about cannibalization between Getaways and the core travel business do not, in and of themselves, convey any information about Travelzoo's overall growth and revenue. Thus, Plaintiffs fail to sufficiently allege that the economic harm they suffered was caused by Defendants' failure to disclose the allegedly adverse impact that cannibalization between Getaways and Travelzoo's core travel branch had on Travelzoo's overall growth and revenues. The facts alleged indicate that the cause of the stock's decline was general market disappointment in not meeting analysts' higher expectations.

## I.     Section 20(a) Control Person Liability Claim

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *See ATSI Communs*, 493 F.3d at 108; *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). Having failed to allege an underlying securities violation by Travelzoo pursuant to Section 10(b) and Rule 10b-5, Plaintiffs' control liability claim is, as a matter of law, defective. Accordingly, Plaintiffs have failed to state a claim under Section 20(a) against any of the Individual Defendants.

## CONCLUSION

Defendants' motions to dismiss are GRANTED. The Consolidated and Amended Class Action Complaint is DISMISSED.

Dated: March 29, 2013
      New York, New York

SO ORDERED:

*[signature]*
GEORGE B. DANIELS
United States District Judge

MAR 29 2013

Case 1:11-cv-05531-GBD   Document 59   Filed 03/29/13   Page 19 of 19